[Docket Nos. 3057, 3058, 3061, 3066, 3067, 3068, 3070]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | MDL No. 19-2875 (RMB/SAK) |
| **THIS DOCUMENT RELATES TO:** *Gaston Roberts, et al. v. Zhejiang Huahai Pharmaceutical Co., Ltd., et al.,* Case No. 1:20-cv-00946 (RMB/SAK) | **OPINION** |

**APPEARANCES**

C. Brett Vaughn
Daniel Nigh
Ashleigh Raso
NIGH GOLDENBERG RASO & VAUGHN, PLLC
14 Ridge Square NW, 3rd Floor
Washington, DC 20016

 *Attorneys for Plaintiff Jan Roberts*

Jessica Davidson
Allison M. Brown
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022

Nina R. Rose
Jordan M. Schwartz
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

 *Attorneys for Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Solco Healthcare U.S., LLC, and Prinston Pharmaceutical Inc.*

**RENÉE MARIE BUMB, Chief United States District Judge:**

Now before the Court are a series of pre-trial motions in what was to be the first bellwether trial in this multi-district litigation ("MDL").[1] Of particular import to both the Court and the parties and, therefore, the focus of this Opinion is the Motion to Exclude the Opinions of Dr. Fareeha Siddiqui [Docket No. 3068] filed by the Defendants.

The Court prefaces this Opinion by highlighting the "special dangers to the fact-finding process" inherent in scientific expert testimony. *See United States v. Ford*,

---

[1]      Plaintiff Jan Roberts ("Plaintiff"), as personal representative and spouse of Mr. Gaston J. Roberts, Jr. ("Mr. Roberts") has moved to exclude the testimony of defense experts Dr. Andrew Thompson [Docket No. 3057], Dr. Victoria Chernyak [Docket No. 3066], Dr. Nadim Mahmud [Docket No. 3067], and Dr. Gregory Diette [Docket No. 3070]. The Court heard testimony from Dr. Thompson and, as set forth on the record, had indicated its intention to reserve its decision. The Court also heard testimony from Dr. Mahmud and, for the reasons set forth on the record, Plaintiff's motion to exclude his testimony was denied. Given the impact of the instant Opinion, the motions to exclude the testimony of Drs. Diette and Chernyak are denied as moot.

Defendants Zhejiang Huahai Pharmaceuticals Co., Ltd., Prinston Pharmaceutical Inc. d/b/a Solco Healthcare LLC, and Solco Healthcare U.S. (collectively, the "Defendants" or "ZHP") have moved to exclude the testimony of Plaintiff's experts Dr. John Russo [Docket No. 3058] and Dr. Fareeha Siddiqui [Docket No. 3068], as well as for summary judgment [Docket No. 3061]. The parties have resolved the issues as to Dr. Russo. Accordingly, the motion to exclude his testimony is denied as moot. Defendants also moved to exclude the testimony of Plaintiff's expert Dr. William Sawyer [Docket No. 3060], which was referred by this Court to the Special Master, Hon. Thomas I. Vanaskie (ret.). Judge Vanaskie denied that motion [Docket No. 3167]. Defendants indicated their intent to appeal that denial to this Court. In light of the instant Opinion, any appeal would be moot. But the Court finds that Defendants have preserved their position should Dr. Sawyer's testimony be presented in another action in this MDL. [*See* 9/3/25 Tr. 87:7-88:4 (Docket No. 3170).]

481 F.3d 215, 220 n. 6 (3d Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 (9th Cir. 1995)). "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993); *see also United States v. Soler-Montalvo*, 44 F.4th 1, 16 (1st Cir. 2022) ("there is a particular worry with expert testimony that jurors may assign more weight to it than it deserves. Expert testimony can carry with it an unwarranted aura of special reliability and trustworthiness.") (cleaned up). To safeguard against these "special dangers," district courts must "tread carefully when evaluating proffered expert testimony." *Ford*, 481 F.3d at 220 n. 6. Given these "special dangers," this Court, along with its sister courts, has been entrusted with an essential and rigorous gatekeeping duty to ensure the reliability and relevance of an expert's testimony prior to a jury considering it. *See Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025).

Plaintiff implores the Court to allow the jury to sort through Dr. Siddiqui's testimony. This Court cannot do that – essentially taking the expert's word for it – without abandoning its gatekeeping responsibility. FED. R. EVID. 702, Advisory Committee's note to 2000 amendments. "Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." FED. R. EVID. 702, Advisory Committee's note to 2023 amendments.

Having considered the parties' submissions[2] and having had the benefit of extensive oral argument and a *Daubert* hearing, the Court now exercises its essential gatekeeping function and resolves the motion before it.  For the reasons set forth herein, Defendants' Motion to Exclude the Opinions of Dr. Siddiqui is **GRANTED** in full.

## I.    PROCEDURAL HISTORY

This Court has had occasion to describe this litigation before:

> This MDL as a whole is sprawling, encompassing dozens of classes of plaintiffs, upstream and downstream defendants, and multiple theories of liability covering both economic losses and personal injury.  Valsartan is the generic name of the now off-patent anti-hypertensive drug Diovan®.  It is also used in a combination heart failure drug called Exforge®.  At its core, the litigation involves the alleged contamination with nitrosamines of certain Valsartan-containing drugs manufactured, distributed, or sold by Defendants (the "VCDs") from January 1, 2012 through the recalls of those drugs in the summer of 2018.[3]

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, 2025 WL 1024048, at *1 (D.N.J. Apr. 7, 2025).

---

[2]    Defendants filed a brief in support of their motion to exclude Dr. Siddiqui's expert testimony [Defs.' Br. (Docket No. 3069)].  Plaintiff has opposed [Pl.'s Opp'n (Docket No. 3097)] and Defendants have submitted a reply brief in further support of the motion [Defs.' Reply (Docket No. 3117)].  At the direction of the Court, the parties filed supplemental submissions in support of their respective positions.  [Defs.' Supp. Br. (Docket No. 3160); Pl.'s Supp. Br. (Docket No. 3161).]

[3]    The specific nitrosamine alleged to have been present in the VCDs consumed by Mr. Roberts is N-Nitrosodimethylamine ("NDMA"), which has been classified as probable genotoxic carcinogen by the U.S. Food and Drug Administration ("FDA").

This Opinion concerns just one of over more than one thousand member cases in the MDL, which was chosen by the parties as the first bellwether personal injury trial. This action was filed by Mr. Roberts and his wife in January 2020, asserting various claims under Alabama state law.[4]  In March 2020, Mr. Roberts passed away and his wife was substituted as Plaintiff as the personal representative of her husband's estate. [Docket No. 6.]  A jury trial was scheduled to begin in early September 2025. In advance of trial, the parties submitted various pre-trial motions. The Court held *Daubert* hearings and oral argument on the motions on August 26, 2025 and September 3, 2025. The Court indicated to the parties on the record that, after thoroughly considering the parties' arguments and Dr. Siddiqui's live testimony, it intended to exclude the testimony of Dr. Siddiqui. [9/3/25 Tr. 8:16-9:2.]  In response, Plaintiff conceded that without Dr. Siddiqui's testimony – Plaintiff's only specific medical causation evidence – summary judgment in favor of Defendants was appropriate on all claims. [*Id.* 9:9-11:15.]  As a result, the Court adjourned the trial.

## II.    FACTUAL BACKGROUND

The following facts are generally not in dispute, unless noted. Mr. Roberts began taking Defendants' NDMA-contaminated VCDs in September 2016. His last prescription for the affected valsartan was filled in June 2018. On July 13, 2018,

---

[4]    Plaintiff intended to assert the following claims at trial: (i) manufacturing defect, (ii) failure to warn, (iii) negligence, (iv) negligence per se, (v) common law fraud, (vi) wrongful death, (vii) survival action, (viii) loss of consortium, and (ix) punitive damages. Plaintiff voluntarily withdrew her breach of warranty and Alabama Deceptive Trade Practices Act claims [Docket No. 3139].

Defendants voluntarily recalled their affected VCDs due to the detection of NDMA. In August 2018, Mr. Roberts was diagnosed with hepatocellular carcinoma ("HCC"), a common and aggressive form of liver cancer. Mr. Roberts unfortunately passed away in March 2020 at the age of sixty-four.

The heart of the parties' dispute is whether Plaintiff can establish specific causation in light of Mr. Roberts's other extensive and significant risk factors for HCC.[5] In other words, does Plaintiff have reliable, admissible evidence from which a jury could find that Mr. Roberts's cancer was caused by his exposure to NDMA in his valsartan medication, as opposed to his numerous other risk factors? For the reasons set forth herein, the Court finds that she does not.

## A. MASH and MASLD

Mr. Roberts had a decades-long history of liver problems. In August 2009, Mr. Roberts was referred by his physician for abnormal liver function tests. [Rose Decl.[6] Ex. 6 at GRobertsJr-CA-000661 (Docket No. 3072-5).] He reported struggling with elevated "liver numbers" since his teenage years and that "[h]e has been told over

---

[5]    Defendants also contest Plaintiff's ability to prove general causation. As the adequacy of Plaintiff's evidence establishing general causation is not at issue in the motions presently before the Court, the Court does not address it.

[6]    "Rose Decl." refers to the Declaration of Nina Rose in support of Defendants' Motion to Exclude the Opinions of Dr. Fareeha Siddiqui [Docket No. 3071]. On occasion, the Court relies upon exhibits appended to the Declaration of Nina Rose in support of Defendants' Motion for Summary Judgment and Statement of Material Facts Not in Dispute ("Summ. J. Rose Decl.") [Docket No. 3064].

the years that he probably has a fatty liver, i.e. NASH."[7]  [*Id.*]  In September 2009, after test results showing "abnormal mild transaminitis,"[8] Mr. Roberts underwent an ultrasound, which "demonstrate[d] fatty liver."  [Summ. J. Rose Decl. Ex. 27 at GRobertsJr-CA-000654 (Docket No. 3065-26).]   His treating gastroenterologist, Dr. Christopher W. Ives, indicated that MASH was his primary impression of Mr. Roberts's condition, though he also noted that there was "no evidence of decompensation at least biochemically and physical exam showed no evidence of portal hypertension."  [*Id.*]  Dr. Ives and Mr. Roberts discussed the possibility of a liver biopsy, but Mr. Roberts was not interested, which his physician noted was "understandable and probably not completely necessary at this time."  [*Id.*]

In March 2011, Mr. Roberts was seen again by Dr. Ives, who listed noted nonspecific abnormal results of liver function study under Mr. Roberts's past medical history.  [Rose Decl. Ex. 17 at GRobertsJr-ESMS-000017 (Docket No. 3072-16).]   He was not seen by Dr. Ives again until July 2015.  [*Id.* at GRobertsJr-ESMS-000045.]

---

[7]   "NASH" refers to non-alcoholic steatohepatitis, which is now referred to as metabolic dysfunction-associated steatohepatitis or "MASH."  The related condition previously referred to as non-alcoholic fatty liver disease or "NAFLD" is now referred to as metabolic dysfunction-associated steatotic liver disease or "MASLD."  The nomenclature changed in 2023.  [*See* Defs.' SMF ¶ 38.]  The parties and their experts often utilize the current and outdated terminology interchangeably.  The Court, for clarity, will use "MASH" or "MASLD" as appropriate, unless quoting directly from the record.

[8]   Transaminitis occurs when a patient has elevated levels of certain liver enzymes in their blood, which indicates underlying liver stress or damage.  [*See* Mahmud Tr. 144:23-145:5 (Docket No. 3168).]

Dr. Ives noted both MASH and nonspecific abnormal results of liver function study under Mr. Roberts's past medical history. [*Id.*] Mr. Roberts visited Dr. Ives again in early April 2016 because of constant abdominal pain that had been ongoing for about a year. [*Id.* at GRobertsJr-ESMS-000006.] He saw Dr. Ives a few months later for continued abdominal pain. [*Id.* at GRobertsJr-ESMS-000002.] Dr. Ives noted that his "LFTs" (or liver function tests) were elevated and listed MASH and abnormal liver function study as past medical diagnoses. [*Id.*] Dr. Ives's own assessment included "fatty liver." [*Id.* at GRobertsJr-ESMS-000005.]

Mr. Roberts's medical records from January 2018 indicate that his "past medical history" included MASH and "[n]onspecific abnormal results of liver function study." [*Id.* at GRobertsJr-CA-000210, GRobertsJr-CA-000215.]

### B. Cirrhosis

Mr. Roberts also had a history of liver fibrosis and cirrhosis. It is unclear from his medical records when this first arose. His medical records from 2009 permitted defense expert Dr. Mahmud to calculate his Fib-4 score, which was 1.99, representing indeterminate liver fibrosis.[9] [Mahmud Report at 21.] Laboratory results from

---

[9] As Dr. Mahmud explained, "[t]he current best practice recommendations from major society guidance are to calculate a blood-based fibrosis score called the Fib-4, which is computed using a patient's age, AST, ALT, and platelet count." [Mahmud Report at 18 (Docket No. 3067-3).] Fib-4 scores are an important "risk stratification tool" routinely used "to identify patients who are highly likely to have cirrhosis." [Mahmud Tr. 147:10-23.] "In patients with MASLD, a Fib-4 <1.3 effectively rules out advanced fibrosis, with a ≥90% negative predictive value. . . . By contrast, a Fib-4 >2.67 denotes a very high risk of advanced fibrosis. Specifically, patients with a Fib-4 >2.67 have a ~80% positive predictive value of having cirrhosis. In other words,

November 2015 showed that Mr. Roberts's Fib-4 score had increased to 3.22, which indicated advanced fibrosis or possible cirrhosis.  [*Id.*]

In early April 2016, Mr. Roberts underwent an ultrasound scan of his abdomen. The scan showed "hepatomegaly measuring 20 cm," "fatty hepatic infiltrate," and "2 solid densities" in "the liver measuring 2.0 and 1.8 cm at their widest diameter." [Vaughn Cert. Ex. 17 at Infirmary_GRobertsJr00014 (Docket No. 3097-18).]  A follow-up CT scan later that month showed that the "[p]eripheral margin of [Mr. Roberts's] liver [was] somewhat lobulated" and that an "8 mm focal hypodensity [was] seen in the right lobe."  [Rose Decl. Ex. 51 at GRobertsJR-TH-MD-000944 (Docket No. 3072-50).]  The scan showed other cirrhosis symptoms, including "enlargement of the caudate lobe, and diffuse heterogenous attenuation throughout the liver parenchyma," and "recanalization of the paraumbilical vein."  [Mele Report at 2 (Docket No. 3072-38).]  The radiologist reviewing the CT scan stated that the "findings above may be evidence of liver cirrhosis."   [Rose Decl. Ex. 51 at GRobertsJR-TH-MD-000944.]  As to the hypodensity, the radiologist noted that it was "too small to definitively characterize.  Benign or malignant etiologies could have this appearance.[10] . . . Follow-up liver protocol CT 4-6 months from date of study would

---

among 100 patients with Fib-4 >2.67, about 80 of these patients will truly have cirrhosis based on this test result alone. . . . Finally, patients with a Fib-4 between 1.3 and 2.67 are in an indeterminate range for advanced fibrosis/cirrhosis and should undergo [further testing] as a next step to determine the likelihood of cirrhosis and inform the need for hepatology referral."  [Mahmud Report at 18.]

[10]    Plaintiff's expert radiologist, Dr. Christopher Mele, agreed that it was impossible to characterize whether the hypodensities on the CT scan were malignant

be useful for further characterization." [*Id.*]  No such follow-up took place.  At the time of his cancer diagnosis in August 2018, described below, Mr. Roberts had advanced decompensated cirrhosis.  [Siddiqui Dep. 136:20-21, 267:10-12 (Docket No. 3072-6).]

**C. Obesity and Diabetes**

Mr. Roberts's medical records show that from 2008 through early 2018, he consistently had a Body Mass Index ("BMI") score indicating that he was obese or morbidly obese.  [Rose Decl. Ex. 17 at GRobertsJr-AMG-000028-30, GRobertsJr-CA-000210, GRobertsJr-CA-000722, GRobertsJr-ESMS-000004, GRobertsJr-ESMS-000047, GRobertsJr-ESMS-000053.]  His medical records note that Mr. Roberts had diabetes as early as December 2007, when his records showed his A1C at 6.9%.  [Rose Decl. Ex. 12 at GRobertsJr-CA-000729 (Docket No. 3072-11).]  In July 2016, medical records note that Mr. Roberts had Type 2 diabetes mellitus with hyperglycemia and that his A1C levels were above 9.0%.  [Rose Decl. Ex. 13 at GRobertsJr-AMG-000042-44 (Docket No. 3072-12).]

**D. HCC (Liver Cancer) Diagnosis**

On July 17, 2018, Mr. Roberts presented to the emergency department at Thomas Hospital in Fairhope, Alabama due to worsening abdominal pain in his left

---

or benign.  [Mele Dep. 161:22-162:3 (Docket No. 3072-39).]  Dr. Samuel Hooks, Mr. Roberts's treating gastroenterologist, could not exclude the possibility that the lesion "evolved into" the HCC tumors identified in 2018.  [Hooks Dep. 73:20-23 (Docket No. 3072-36).]

side and radiating to the back.  [Summ. J. Rose Decl. Ex. 34 at GRobertsJR-TH-MD-001026 (Docket No. 3065-33).]  Mr. Roberts reported that he had been experiencing this pain for two to three days, as well as nausea.  [*Id.*]  A CT scan of Mr. Roberts's abdomen and pelvis revealed an enlarged liver and spleen with "evidence of diffuse hepatic parenchymal disease likely cirrhosis."  [*Id.* at GRobertsJr-TH-MD-001028.]  A right upper quadrant ultrasound revealed an enlarged liver, hepatic steatosis, and a "vague hypoechoic area within the right lobe of the liver."  [*Id.*]  A follow-up MRI was recommended.  [*Id.*]  "Probable cirrhosis" and history of MASH were noted.  [*Id.*]  The follow-up MRI showed multiple masses that were "highly suspicious for multifocal HCC," "especially in the setting of cirrhosis."  [Rose Decl. Ex. 24 at GRobertsJr-PPR-000106 (Docket No. 3072-23); Rose Decl. Ex. 27 at GRobertsJr-SouCC-000251 (Docket No. 3072-26).]

In August 2018, Mr. Roberts's hepatologist, Dr. Jared White, noted that he had "NASH cirrhosis and two hepatic lesions . . . concerning for HCC."  [Rose Decl. Ex. 29 at GRobertsJr-PPR-000093 (Docket No. 3072-28).]  Dr. White further noted that Mr. Roberts had undergone an "extensive work up for cirrhosis" which "is essentially negative."  [*Id.*]  Dr. White noted that Mr. Roberts did not have a "significant [history of] liver disease other than risk factors for NASH cirrhosis" and that, while Mr. Roberts was "[w]ell compensated, [his liver] has cirrhotic configuration."  [*Id.* at GRobertsJr-PPR-000097.]

Shortly thereafter, Mr. Roberts was diagnosed with HCC.  [Rose Decl. Ex. 23 at GRobertsJr-UABHIM-MD-000002-6 (Docket No. 3072-22).]  His treating radiation

oncologist described Mr. Roberts's condition as HCC "arising from background of NASH cirrhosis." [Rose Decl. Ex. 5 at GRobertsJr-UABHIM-MD-000083 (Docket No. 3072-4).] In December 2018, Mr. Roberts's physician characterized his HCC as an advanced "Stage IIIA" carcinoma and noted that Mr. Roberts had cirrhosis secondary to MASH. [Rose Decl. Ex. 25 at GRobertsJr-SouCC-000235 (Docket No. 3072-24).] Mr. Roberts continued to be treated at Thomas Hospital in Fairhope, Alabama, from his admission to the emergency department in July 2018 until his death on March 17, 2020. [Defs.' SMF ¶¶ 60–61.]

## III. THE LEGAL STANDARDS GOVERNING THE ADMISSIBILITY OF EXPERT TESTIMONY

Federal Rule of Evidence 702 governs the admissibility of expert testimony, permitting a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion, provided that "the proponent demonstrates to the court that it is more likely than not that:"

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.[11]  The party that proffers the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence.  *Daubert*, 509 U.S. at 592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987)).

Because Rule 702 "clearly contemplates some degree of regulation of the subjects and theories" to which an expert may testify, the Supreme Court has stated:

> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method.  Proposed testimony must be supported by appropriate validation—i.e., "good grounds" based on what is known.  In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Id.* at 590; *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 144–45 (3d Cir. 2000).

### *The Court's Function as Gatekeeper*

The Court must act as a "gatekeeper" to prevent expert testimony running afoul of Rule 702 from ever reaching the jury.  *See Daubert*, 509 U.S. at 596–97; *see also Cohen*, 125 F.4th at 460 ("District courts are tasked with a 'rigorous gatekeeping function'") (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)).  "This gatekeeping function is necessarily 'flexible,' granting district courts 'latitude in deciding *how*' these requirements are met."  *Cohen*, 125 F.4th at 460 (internal citations omitted).  "But this leeway 'is not discretion to abandon the gatekeeping function' or 'perform the function

---

[11]    The Court applies the current version of Rule 702, which was amended effective December 1, 2023.  The amendment does not substantively alter Rule 702, but rather "clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard."  FED. R. EVID. 702, advisory committee's note to 2023 amendments.

inadequately.'" *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158–59 (1999) (Scalia, J., concurring)).

Thus, the Court "must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. The Third Circuit has described Rule 702 as embodying a "trilogy of restrictions on expert testimony: [1] qualification, [2] reliability, and [3] fit." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003)); *see also Cohen*, 125 F.4th at 460.

### *The Trilogy of Restrictions on Expert Testimony*

First, the witness must be qualified to testify as an expert, which requires "that the witness possess specialized expertise." *Calhoun*, 350 F.3d at 321. This requirement, however, has been interpreted liberally to encompass "a broad range of knowledge, skills, and training." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).

Second, the testimony must be reliable, which demands that "the expert's opinion must be based upon the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.'" *Calhoun*, 350 F.3d at 321 (quoting *Paoli*, 35 F.3d at 742). In other words, the Court must ensure that the evidence

adduced is scientifically valid. *Daubert*, 509 U.S. at 590. In determining the reliability of expert testimony, the Court is guided by the following factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Calhoun*, 350 F.3d at 321 (quoting *Paoli*, 35 F.3d at 742 n.8). The Court is not restricted to any "definitive checklist or test." *Daubert*, 509 U.S. at 593. This inquiry is "a flexible one" focusing "solely on the principles and methodology, not on the conclusions that they generate." *Id.* at 595.

While reliability does not require "correctness," it does prohibit "too great a gap between the data and the [expert's] opinion proffered." *Oddi*, 234 F.3d at 146 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, the court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Id.* (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)).

Third, the expert's testimony must "fit" the case. *Daubert*, 509 U.S. at 592. Otherwise known as the "helpfulness" standard, this restriction requires there to be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92. The fit requirement "goes primarily to relevance." *Id.* at 591. "[T]he expert's testimony must be relevant for the purposes of the case and must assist the

trier of fact." *Schneider*, 320 F.3d at 404 (citations omitted); *United States v. Zimmerman*, 277 F.3d 426, 433 n.4 (3d Cir. 2002) ("It is well-established that an expert opinion must be tailored to the specific facts of the case to have any value."). While not a high bar, the standard is "higher than bare relevance." *Ford*, 481 F.3d at 220 n.6 (quoting *Paoli*, 35 F.3d at 745).

## IV.    MOTION TO EXCLUDE DR. SIDDIQUI'S TESTIMONY

The Court now considers Defendants' challenges to Dr. Siddiqui's expert testimony. The parties agree that the Court's resolution of this motion is case dispositive if the Court excludes Dr. Siddiqui's testimony. Put plainly, Dr. Siddiqui's testimony is Plaintiff's sole evidence of specific causation, and, without her testimony, Plaintiff concedes that her case fails. Defendants contend that Dr. Siddiqui's testimony should be excluded because the differential diagnosis underlying her opinion is fundamentally flawed in that she both failed to reliably "rule in" Mr. Roberts's exposure to NDMA in valsartan and "rule out" Mr. Roberts's numerous well-established independent risk factors for HCC.

### A. Dr. Siddiqui's Qualifications

Defendants do not dispute Dr. Siddiqui's qualifications. She is a board-certified hematologist and medical oncologist. She has over twenty years of clinical experience in internal medicine, hematology, and oncology. After completing her residency in internal medicine in 2003, she completed a three-year double fellowship in hematology and oncology. Dr. Siddiqui spent about half of this fellowship studying the causation, diagnosis, and treatment of solid cancers, such as HCC. She is currently an Associate

Physician Diplomate of Medicine at the University of California, San Diego. As part of her practice, she diagnoses and treats patients with liver cancer daily. [Siddiqui Report at 1–2 (Docket No. 3072).]

## B. <u>Dr. Siddiqui's Methodology and Opinions</u>

Plaintiff offers Dr. Siddiqui as a specific causation expert in this case. Dr. Siddiqui testified that, in her medical opinion, Mr. Roberts's HCC was caused by his exposure to NDMA that was present in ZHP's valsartan pills. Specifically, she opined that Mr. Roberts's exposure to NDMA was a substantial factor in causing his HCC.[12] She further opined that his myriad other risk factors, such as cirrhosis, diabetes, obesity, and MASH/MASLD, were not substantial factors in causing his cancer.

To reach this conclusion, Dr. Siddiqui performed a differential diagnosis, which involves ruling in and ruling out possible causes and contributing factors of Mr. Roberts's HCC. In carrying out her differential diagnosis, Dr. Siddiqui first identified risk factors associated with developing HCC. To do so, she reviewed medical and scientific literature, medical databases, and guidance from organizations like the American Cancer Society and the NIH regarding the risk factors for HCC. [Siddiqui Tr. 25:3-11 (Docket No. 3168).] Although these organizations did not list

---

[12] Dr. Siddiqui defined a "substantial factor" as "a factor that a reasonable person would consider to have been a cause of the cancer. A substantial [factor] must be more than a remote or trivial factor. A substantial factor does not have to be the only cause of the harm." [Siddiqui Report at 1.]

NDMA specifically as a risk factor, carcinogens in general were at times included. Because NDMA is a carcinogen, Dr. Siddiqui included it as a risk factor to consider in her differential diagnosis. [*Id.* 25:12-25.]

Dr. Siddiqui then determined which of these risk factors applied to Mr. Roberts given his medical and social history. She was able to rule out several risk factors that were inapplicable to Mr. Roberts.[13] [Siddiqui Report at 29; Siddiqui Tr. 26:6-20.] For example, viral hepatitis and chronic excessive alcohol consumption are risk factors for HCC but could readily be ruled out because Mr. Roberts did not have viral hepatitis and was not a heavy drinker. [Siddiqui Tr. 26:6-14.] She narrowed the relevant risk factors to NDMA in valsartan, pre-existing cirrhosis, MASLD/MASH, obesity, diabetes, and hyperlipidemia. [Siddiqui Report at 29–31.]

Finally, Dr. Siddiqui considered each of these applicable risk factors, ruling each either in or out to determine which was a substantial factor in causing Mr. Roberts's cancer. As explained below, she ruled out Mr. Roberts's diabetes, MASLD/MASH, obesity, and cirrhosis. She ultimately opined that Mr. Roberts's exposure to NDMA in his valsartan was a substantial factor in causing his HCC.

---

[13]     These risk factors included viral hepatitis, chronic excessive alcohol consumption, tobacco use, aflatoxins, anabolic steroids, gender, race/ethnicity, age, iron overload, Glycogen Storage Disease, Alpha-1 Antitrypsin Deficiency, hypercitrullinemia, Alagille Syndrome, and Acute Intermittent Porphyria.

### i.    Diabetes, MASLD/MASH, and Obesity Ruled Out

Dr. Siddiqui considered several of Mr. Roberts's known risk factors "under the umbrella of metabolic syndrome." [Siddiqui Tr. 52:14-18; *see also* Siddiqui Report at 29.]   Dr. Siddiqui opined that "MASLD is a cluster of conditions – insulin resistance, hypertension, hypertriglyceridemia, and abdominal obesity." [Siddiqui Report at 21.] She explained that this "metabolic syndrome" is an umbrella term that includes "having obesity, having hyperlipidemia, even hypercholesteremia sometimes, diabetes." [Siddiqui Tr. 52:14-24.]

In her view, obesity is not a significant risk factor alone for liver cancer and is only associated with an increased risk for developing liver cancer because it can result in MASLD and cirrhosis. [Siddiqui Report at 22.] Dr. Siddiqui opined that "the increased risk of liver cancer due to obesity would have been negligible, and again best captured based on the degree of his liver cirrhosis." [*Id.* at 30.] She applied the same reasoning to Mr. Roberts's hyperlipidemia, which she states increases the risk of liver cancer by causing MASH, which then can cause cirrhosis. [*Id.*]

Dr. Siddiqui similarly recognized that "Type 2 diabetes is linked with an increased risk of liver cancer" because it can contribute to MASLD. [*Id.* at 22–23.] She also noted that Mr. Roberts was not diagnosed with diabetes until November 14, 2016 (after he began taking the contaminated valsartan) and that his diabetes was well controlled. [*Id.* at 30.]

Turning to MASLD, Dr. Siddiqui recognized that it "has been increasingly linked to liver cancer, especially in individuals with progression to [MASH]."

18

[Siddiqui Report at 21.]  But she reasoned that the resulting increased risk of liver cancer would be captured by the degree of his liver cirrhosis.  [*Id.* at 30.]  She explained that the progression from MASLD/MASH to cirrhosis is "slow" and "stepwise," as is the progression from cirrhosis to HCC.  [Siddiqui Tr. 53:2-6.]  In her opinion, Mr. Roberts's progression from a questionable MASH diagnosis to eventual advanced cirrhosis and cancer was inconsistent with this slow, stepwise progression. Accordingly, Dr. Siddiqui ruled out metabolic syndrome as the cause of his HCC. [*Id.* 54:1-9.]

### ii.    Cirrhosis Ruled Out

Dr. Siddiqui recognized that "[c]irrhosis is one of the most significant risk factors for liver cancer," and that the "increased risk of liver cancer associated with cirrhosis is particularly pronounced in individuals who have . . . MASLD that progressed to cirrhosis."  [Siddiqui Report at 21.]  According to Dr. Siddiqui, "[f]rom the time cirrhosis is first *diagnosed*, it takes approximately 7-10 years before increased rates of HCC are observed."  [*Id.* at 21–22 (emphasis in original).]

Dr. Siddiqui testified that liver disease proceeds in a "stepwise progression" that begins with a healthy liver, which over time – "over many, many years usually" – develops inflammation, then develops areas of fibrosis and scar tissue, which eventually results in cirrhosis.  [Siddiqui Tr. 15:23-16:8.]  "[A] small portion of people with cirrhosis go on to develop hepatocellular or liver cancer.  And a lot of them end up developing end-stage liver disease."  [*Id.* 16:8-11.]

In Dr. Siddiqui's view, "[a]ny increased risk of liver cancer that Mr. Roberts was at would essentially be captured by the degree of cirrhosis he had prior to being exposed to valsartan contaminated with NDMA." [Siddiqui Report at 30.] In her view, Mr. Roberts had only "incredibly mild, the earliest stages of cirrhosis prior to being exposed to valsartan contaminated with NDMA." [*Id.*] She would not have expected him to receive an actual diagnosis of cirrhosis in 2016 because it was so "mild." [*Id.*] Based on her review of Mr. Roberts's April 2016 CT scan, she believed he would be "between inflammation and possible fibrosis at that time," rather than cirrhosis. [Siddiqui Tr. 16:13-18.] She rejected the radiologist's reading that the "findings above may be evidence of liver cirrhosis" because Mr. Roberts had no physical symptoms, which she claimed are necessary to make a clinical diagnosis of cirrhosis. [*Id.* 16:20-17:16; 19:2-3.]

Had Mr. Roberts developed HCC because of pre-existing cirrhosis that was unrelated to any NDMA exposure, Dr. Siddiqui would not have expected it to develop until August 2025 at the earliest, utilizing what she viewed as the "aggressive type time frame of seven years from diagnosis in August 2018." [Siddiqui Tr. 50:22-51:8.] And, even if he had been diagnosed with cirrhosis in 2016, Dr. Siddiqui would not have expected to see HCC develop until April 2023. [*Id.* 51:9-21.] Accordingly, because she viewed Mr. Roberts's timeline to be inconsistent with the typical progression from cirrhosis to HCC, Dr. Siddiqui ruled out cirrhosis as the cause of his HCC. [*Id.* 51:22-52:10.]

### iii.    NDMA Exposure from Valsartan Ruled In

Finally, Dr. Siddiqui determined that NDMA exposure in drugs was a risk factor for HCC.  She reasoned that NDMA is classified as probable human carcinogen and that animal studies have consistently demonstrated NDMA-induced liver cancer in rodents and a dose response.  [Siddiqui Report at 25.]  She also considered the Hidajat Study, which showed dose response in rubber and dye factory workers who were exposed to NDMA and developed liver cancer,[14] as well as three epidemiological studies – Pottegård,[15] Gomm,[16] and Mansouri[17] – that attempted to measure the association between exposure to NDMA in valsartan and risk of liver cancer.

The Pottegård study did not find an association between NDMA exposure in valsartan and liver cancer.  Dr. Siddiqui found this study to have limited, if any, value due to its small sample size.  [Siddiqui Tr. 32:2-33:3.]

---

[14]    Mira Hidajat, et al., *Lifetime Exposure to Rubber Dust, Fumes, and N-nitrosamines and Cancer Mortality in a Cohort of British Rubber Workers with 49 Years Follow-Up*, 76 J. Occupational & Env'tl Med. 250 (2019), https://doi.org/10.1136/oemed-2018-105181 ("Hidajat").

[15]    Anton Pottegård, et al., *Use of N-nitrosodimethylamine (NDMA) contaminated valsartan products and risk of cancer: Danish nationwide cohort study*, 362 BMJ (2018), https://pubmed ncbi nlm nih.gov/30209057/.

[16]    Willy Gomm et al., *N-Nitrosodimethylamine-Contaminated Valsartan and the Risk of Cancer*, 118 Deutsches Arzteblatt Int'l 357, 360 (2021) ("Gomm") [Rose Decl. Ex. 30 (Docket No. 3072-29)].

[17]    Imene Mansouri, et al., *N-nitrosodimethylamine-Contaminated Valsartan and Risk of Cancer: A Nationwide Study of 1.4 Million Valsartan Users*, 11 J. of the Am. Heart Assoc. (2022) ("Mansouri") [Rose Decl. Ex. 31 (Docket No. 3072-30)].

Both the Gomm and Mansouri studies were much larger studies that found a statistically significant increased risk of liver cancer in patients who ingested NDMA-contaminated valsartan. Gomm reported a hazard ratio of 1.16, meaning a 16% increased risk of developing liver cancer.[18] No dose response was detected, however. Gomm followed almost 800,000 patients in Germany and divided them into "ever exposed" and "never exposed" groups. If a patient filled even one valsartan prescription or ingested even one valsartan pill, that patient was included in the "ever exposed" group. So, too, would a patient who used valsartan regularly for years. [Siddiqui Tr. 33:7-20, 33:21-34:3.] The "ever exposed" group also included patients who took valsartan manufactured by different manufacturers whose pills contained vastly different amounts of NDMA. [*Id.* 34:4-9.] Comparing the two groups, the Gomm study found a 16% higher risk of liver cancer in the "ever exposed" group. Dr. Siddiqui, however, testified that the study results were "diluted" because the "ever

-------------------

[18]    "Relative risk is commonly calculated by dividing the risk of developing a disease observed in an exposed group by the risk observed in an unexposed, but otherwise similar group." *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 591 (D.N.J. 2002), *aff'd*, 68 F. App'x 356 (3d Cir. 2003). Relative risk may be denoted in different manners, such as percents, hazard ratios, or odds ratios. *Id.* at 591 n.7. "If the risks of the unexposed and exposed are the same, then the relative risk estimate (which mathematically is simply the former divided by the latter) is 1.0" or 100%. *Id.* at 591. "This value is also called the null value, and indicates that exposure is not associated with the disease in that study. Thus, a relative risk [or hazard ratio] of 1.0 means that the agent has no effect on the incidence of disease. Similarly, if the relative risk estimate is 1.3, then risk appears to be 30% higher among the exposed compared to the non-exposed. When the relative risk [or hazard ratio] reaches 2.0, the risk has doubled, indicating that the risk is twice as high among the exposed group as compared to the non-exposed group." *Id.*

exposed" group included patients who had ingested far less NDMA than Mr. Roberts had, given that he took valsartan daily for two years and that the valsartan he consumed contained much higher amounts of NDMA than the valsartan manufactured by other companies. Accordingly, she believed the true risk to someone in Mr. Roberts's shoes was much higher than observed in Gomm. [*Id.* 34:20-24.]

Mansouri reported a hazard ratio of 1.12, or a 12% increased risk. No dose response was detected in Mansouri, either. Dr. Siddiqui had similar critiques of the Mansouri study as she did with the Gomm study. Mansouri did not account for the varying amounts of NDMA contamination in valsartan manufactured by different companies. [*Id.* 40:15-41:7.] As a result, Dr. Siddiqui believed there was "a big dilution effect" and that the true increased risk due to the amount of NDMA to which Mr. Roberts was exposed is much greater than what was reported in Mansouri. [*Id.* 41:15-19.] She testified that Mr. Roberts would have had one of the highest exposures compared subjects in that study and, therefore, would have had a higher risk of developing cancer than the average study participant. [*Id.* 56:16-25.]

Dr. Siddiqui examined Mr. Roberts's exposure to NDMA from the contaminated valsartan pills he began taking in September 2016. At the time of the July 2018 recalls, the FDA announced that the "reasonably safe" level of NDMA for human ingestion was 96 nanograms. [July 27, 2018 FDA Press Release, *available at* https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-angiotensin-ii-receptor-blocker-arb-recalls-valsartan-losartan.] Yet each valsartan pill taken by Mr. Roberts from September 2016 to September 2018

contained between 13,180 and 20,190 nanograms, far more than the FDA limit. He took roughly 681 NDMA-contaminated valsartan pills prior to his cancer diagnosis. [Siddiqui Report at 28–29.]

Dr. Siddiqui opined that the "aggressive behavior and rapidity of Mr. Roberts' cancer progression was atypical and was most consistent with a carcinogenic exposure." [*Id.* at 31; *see also* Siddiqui Tr. 30:4-8 ("The timeline of two years wasn't making sense to me. And that's why I believe that it was the NDMA that was promoting that cancer and shortening the timeline and making it very, very fast.").] Typically, according to Dr. Siddiqui, it takes "many, many years, sometimes seven, ten years or more" to progress from early liver disease to cirrhosis and "then cirrhosis to HCC takes another sometimes seven to ten years or ten years or more." [Siddiqui Tr. 28:1-10.] Yet, in her view, he progressed from having "no obvious aggressive signs of disease in 2016" to advanced cancer in 2018. [*Id.* 28:11-17.] Based on this "very shortened latency period or time span," she had "no doubt" that Mr. Roberts's cancer "was caused by his exposure to NDMA contaminated valsartan." [*Id.* 28:16-17; Siddiqui Report at 31.] She does not believe that there were any other substantial factors in causing his liver cancer.

## C. Dr. Siddiqui's Testimony is Unreliable, Conclusion-Driven, and Speculative

There is no dispute that a differential diagnosis is a generally accepted method of opining on specific causation. But "the differential diagnosis must be properly performed in order to be reliable." *Feit v. Great W. Life & Annuity Ins. Co.*, 271 F. App'x 246, 254 (3d Cir. 2008). Here, argue Defendants, it was clearly not. Instead,

Defendants contend that Dr. Siddiqui's opinion is "speculative, result-oriented, [and] unscientific." [Defs.' Br. at 1.] The Court agrees. As explained in detail herein, the Court finds that Dr. Siddiqui did not use, as required, a "scientifically valid methodology to rule in and rule out the potential causes" of Mr. Roberts's cancer. *See In re Zoloft (Sertralinehydrochloride) Prods. Liab. Litig.*, 176 F. Supp. 3d 483, 494–95 (E.D. Pa. 2016), *aff'd sub nom. In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787 (3d Cir. 2017). Nor do her conclusions "reliably flow from the data and methodology." *Feit*, 271 F. App'x at 254. In short, she routinely ignored facts and data that were inconvenient to her ultimate conclusion, demonstrating the conclusion-driven nature of her testimony. Plaintiff accuses Defendants of merely attacking Dr. Siddiqui's conclusions, not her methodology. This accusation is unfounded. While Defendants surely take issue with Dr. Siddiqui's conclusions, their Rule 702 challenges are limited to flaws in her methodology. While Rule 702 challenges must focus "solely on the [expert's] principles and methodology, not on the conclusions that they generate," *Daubert*, 509 U.S. at 595, it does not follow that an expert's conclusions are entirely irrelevant to the analysis. Indeed, courts "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Oddi*, 234 F.3d at 146.

The Court takes this opportunity to reemphasize its critical gatekeeping function. Plaintiff repeatedly urged this Court to permit the jury to hear Dr. Siddiqui's testimony and argued that any flaws with Dr. Siddiqui's testimony should be

addressed, not by the Court on a Rule 702 motion, but through "vigorous cross-examination." [Pl.'s Supp. Br. at 1.] Alternatively, Plaintiff has suggested that this Court reserve its decision until after trial so that it can rule on a "developed record." [9/3/25 Tr. 46:16-21.] This Court shall do no such thing. Given this Court's serious concerns with Dr. Siddiqui's testimony, this would amount to a total abdication of its gatekeeping responsibility. The entire purpose of Rule 702 is to keep unreliable expert testimony from ever reaching a jury. And for good reason. How could the Court ever "unring" the proverbial bell *after* the jury had listened to hours of unreliable expert testimony? The prejudice to Defendants would be insurmountable.

The Court also rejects any insinuation on the part of Plaintiff that this Court is usurping the role of the jury or improperly "nitpicking" Dr. Siddiqui's opinions. [*See* Pl.'s Supp. Br. at 1 (quoting FED. R. EVID. 702, Advisory Committee's note to 2023 amendments).] This Court is required to regulate what expert testimony reaches a jury precisely because of how persuasive and authoritative expert testimony can be. *See Daubert*, 509 U.S. at 595; *Ford*, 481 F.3d at 220 n. 6. Of course, it is the jury's job to weigh the expert testimony presented to it. But first, this Court must ensure that the expert testimony is based on sufficient facts and data and is the product of reliable principles and methods.

### i.    Dr. Siddiqui Did Not Reliably Rule Out Cirrhosis

Cirrhosis is *the* primary and most potent risk factor for HCC.  Eighty to ninety percent of autopsied individuals with HCC were found to have cirrhosis.[19]  Peer-reviewed scientific studies have established that individuals with cirrhosis and other underlying conditions, like MASLD, are up to 3,000% to 4,500% more likely to develop HCC than those without cirrhosis.[20]   Dr. Siddiqui herself recognized that cirrhosis is "one of the most significant risk factors" for liver cancer.  [Siddiqui Report at 21.]  Mr. Roberts had – at the very least – the early stages of cirrhosis in April 2016.  [*See* Siddiqui Report at 30.]   By the time of his cancer diagnosis, his cirrhosis was aggressive and obvious.  [Siddiqui Dep. 136:20-21, 267:10-12.]   And his physicians characterized his cancer as HCC arising out of or in the setting of "NASH cirrhosis." [Rose Decl. Ex. 5 at GRobertsJr-UABHIM-MD-000083.]

Notwithstanding all of this – the immensely increased risk of HCC associated with cirrhosis and Mr. Roberts's history of cirrhosis – Dr. Siddiqui determined that cirrhosis was not a substantial factor in causing Mr. Roberts's cancer.  She reached this conclusion for two primary, but critically flawed, reasons.  First, she claimed that

---

[19]    Giovanna Fattovich et al., *Hepatocellular carcinoma in cirrhosis: incidence and risk factors*, 127 Gastroenterology 35, 36 (2004).

[20]    Kazuo Tarao et al., *Real impact of liver cirrhosis on the development of hepatocellular carcinoma in various liver diseases—meta-analytic assessment*, 8 Cancer Med. 1054 (2019) ("Tarao 2019"); Rongtao Lai et al., *Incidence rates of hepatocellular carcinoma based on risk stratification in steatotic liver disease for precision medicine: A real-world longitudinal nationwide study*, PLoS Med. (2024) ("Lai 2024").

Mr. Roberts had only "mild" cirrhosis in April 2016, which resulted in only a "very minor increased risk" of developing cancer. Second, she claimed that the "timeline" during which Mr. Roberts developed cancer was inconsistent with the typical progression of cirrhosis to HCC. The Court addresses each portion of her opinion in turn.

### a. "Mild" Cirrhosis

As a preliminary matter, regardless of whether Mr. Roberts was formally diagnosed or whether Dr. Siddiqui would or would not have given him a diagnosis – the prong on which she primarily hangs her hat – the overwhelming evidence in this case points to the conclusion that Mr. Roberts suffered from some degree of cirrhosis prior to ingesting any contaminated valsartan and prior to his cancer diagnosis. And even Dr. Siddiqui agrees with this conclusion. Dr. Siddiqui's expert report was clear: "it is my opinion that Mr. Roberts had incredibly mild, the earliest stages of cirrhosis prior to being exposed to valsartan contaminated with NDMA." [Siddiqui Report at 30.] That Dr. Siddiqui "would not have given him an actual diagnosis at this time" is beside the point. [*Id.*][21] She reiterated that he had "very mild and undiagnosed cirrhosis" prior to ingesting NDMA. [*Id.*] And, Dr. Mele, Plaintiff's expert radiologist, opined that the April 2016 CT scan was "consistent with cirrhosis." [Mele Report at 3; *see also* Mele Dep. 157:14-21.] Dr. Siddiqui agreed with his findings. [Siddiqui Dep. 97:22-23.] The April 2016 scan itself showed findings that "may be

---

[21]    Dr. Siddiqui is a hematologist and oncologist. She is not a hepatologist.

evidence of liver cirrhosis." [Rose Decl. Ex. 51 at GRobertsJR-TH-MD-000944.] The liver appeared nodular and lobulated and, as even Plaintiff's expert radiologist opined, the CT scan showed recanalization of the umbilical vein, which is indicative of cirrhosis. [Mele Report at 2; *see also* Mahmud Tr. 150:13-151:23.] Mr. Roberts's Fib-4 scores, as calculated by Dr. Mahmud, likewise indicated that he may have had cirrhosis for some time.[22] [Mahmud Report at 21.]

At the *Daubert* hearing, Dr. Siddiqui attempted to downplay the implications of the April 2016 CT scan, testifying that the radiologist reported that the "findings were consistent with possible inflammation or nodular formation or fibrosis or cirrhosis." [Siddiqui Tr. 17:1-2.] But that is not what the radiologist reported. Nor did the radiologist state, as Dr. Siddiqui claims, that the CT scan showed only "subtle findings." [*Id.* 17:8-10.] The report stated: "findings above may be evidence of liver cirrhosis." [Rose Decl. Ex. 51 at GRobertsJR-TH-MD-000944.] She then testified that since Mr. Roberts had no symptoms, he could not have diagnosable cirrhosis, which entirely ignores the possibility of compensated or asymptomatic cirrhosis. [Siddiqui Tr. 18:3-7.]

---

[22] Dr. Siddiqui did not consider the Fib-4 scores at all. Nor did she provide any reasoning for ignoring the high Fib-4 score calculated by Dr. Mahmud. Plaintiff attempts to excuse this by arguing that Fib-4 scores are not diagnostic. Defendants do not dispute this. It is, however, an important "risk stratification tool" that Dr. Mahmud testified is routinely used "as a best practice tool . . . to identify patients who are highly likely to have cirrhosis." [Mahmud Tr. 147:10-23.]

When pressed by the Court on her scientific basis for determining that Mr. Roberts did not have cirrhosis in 2016, Dr. Siddiqui testified that "the liver looks quite hydrogenous, as in it looks clean." [*Id.* 20:13-19.] It is unclear to the Court what exactly she meant by "hydrogenous."[23] But what is readily apparent is that the CT scan did not show a "clean" liver. It showed a "lobulated" liver. [Rose Decl. Ex. 51 at GRobertsJR-TH-MD-000944.] As Dr. Mahmud explained, "[a] normal liver is smooth, like smooth like a table. A liver that has cirrhosis, the scarring will cause retractions along the surface and it looks bumpy or lobulated or nodular." [Mahmud Tr. 150:15-23.] To reiterate, Dr. Siddiqui hangs her opinion hat on the lack of a formal cirrhosis diagnosis in 2016, while ignoring all the medical records suggesting it was present. In any event, given the evidence before this Court of ample findings consistent with cirrhosis, the lack of a formal diagnosis of cirrhosis until the time of his cancer diagnosis is inconsequential. Her opinion is detached from the facts of the case and, therefore, is both unreliable and unhelpful to a jury. There is simply "too great a gap between the data" and the opinions she has preferred. *Oddi*, 234 F.3d at 146 (quoting *Joiner*, 522 U.S. at 146).

Dr. Siddiqui then opined that "Mr. Roberts would have had a very minor increased risk of liver cancer because of the degree of cirrhosis he had in 2016."

---

[23]    The Court suspects she meant "homogeneous." As Dr. Mele explained, a non-cirrhotic liver typically "has a very homogeneous attenuation." [Mele Dep. 171:22-23.] By contrast, the CT scan of Mr. Roberts's liver showed "heterogeneous attenuation," which "goes with individuals who have cirrhosis." [*Id.* 172:3-6.]

30

[Siddiqui Report at 30.]  But she made no attempt to quantify the increased risk. *See Magistrini*, 180 F. Supp. 2d at 610 (excluding specific causation expert's testimony wher expert failed to undertake "a quantitative risk assessment" or assess the "respective risks" of possible causes "using the same scientific method.").  Nor did she provide any scientific or medical basis to support her opinion that "mild" cirrhosis results in only a "very minor increased risk" of HCC.  Instead, based on her *ipse dixit* alone, she determined that she could ignore the "very minor" increased risk and rule cirrhosis out as a cause of Mr. Roberts's cancer.  This is not a proper basis for expert testimony.  *In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 579 F. Supp. 3d 675, 680 (E.D. Pa. 2021) (excluding expert testimony that "cite[d] no literature" or "supporting scientific or medical studies" as "nothing more than an *ipse dixit* pronouncement.").  "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Joiner*, 522 U.S. at 146; *accord Player v. Motiva Enters., LLC*, 240 F. App'x 513, 520 (3d Cir. 2007) ("The District Court certainly had the discretion to exclude opinion evidence that is connected to existing data only by the *ipse dixit* [or say-so] of the expert.") (cleaned up).

What's more, "mild" cirrhosis is not a medical term and has no accepted meaning in the medical or scientific literature.  [Mahmud Report at 35; Mahmud Tr. 126:1-19; *see* Siddiqui Tr. 17:17-25 (describing "mild" cirrhosis as a vague "colloquial" term).]  Dr. Siddiqui explained that she used "mild" in a colloquial sense to convey early stage, asymptomatic or "compensated" (as opposed to symptomatic

or "decompensated") cirrhosis. [Siddiqui Tr. 17:17-18:7; Siddiqui Dep. 129:5-13.] But she provided no scientific support for her position that compensated cirrhosis does not meaningfully increase the risk of developing liver cancer. Nor does she engage with the extensive scientific literature cited by Defendants and Dr. Mahmud that directly undermine her opinion, a point that cannot be emphasized enough.

For example, the relevant medical guidelines do not distinguish between "compensated" and "decompensated" cirrhosis and recommend that all patients with cirrhosis *of any type* immediately begin screening for HCC every six months.[24] The scientific literature likewise establishes that cirrhosis is associated with an extremely high risk of HCC, regardless of whether it is compensated or decompensated.[25] Defendants also cite to a 2022 study in Sweden that found significantly increased risks of HCC for both compensated and decompensated cirrhosis patients.[26] Roughly half of the 15,000 study participants had compensated cirrhosis. In the patients with

---

[24]    Amit G. Singal et al., *AASLD Practice Guidance on prevention, diagnosis, and treatment of hepatocellular carcinoma*, 78 Hepatology 1922 (2023) [Rose Decl. Ex. 42 (Docket No. 3072-41); *EASL [European Association for the Study of the Liver] Clinical Practice Guidelines on the management of hepatocellular carcinoma*, 82 J. of Hepatology 315 (2025) [Rose Decl. Ex. 43 (Docket No. 3072-42)]; Yuri Cho et al., *Overview of Asian clinical practice guidelines for the management of hepatocellular carcinoma: An Asian perspective comparison*, 29 Clinical & Molecular Hepatology 252 (2023) [Rose Decl. Ex. 44 (Docket No. 3072-43)].

[25]    *See generally* Tarao 2019; Lai 2024.

[26]    Bonnie Bengtsson et al., *The risk of hepatocellular carcinoma in cirrhosis differs by etiology, age and sex: A Swedish nationwide population-based cohort study*, 10 United European Gastroenterology J. 465 (2022) [Rose Decl. Ex. 45 (Docket No. 3072-44)].

*compensated* (or, as Dr. Siddiqui would put it, "mild") cirrhosis, the study reported a hazard ratio of 167, or an over 16,000% increased risk of HCC. Yet Dr. Siddiqui did not address any of these studies.

Dr. Siddiqui's failure to provide scientific support for her opinions and her refusal to grapple with these contradictory studies renders her testimony unreliable and "nothing more than an *ipse dixit* pronouncement." *Zostavax*, 579 F. Supp. 3d at 680. An expert cannot "ignore completely [a] vast body of contradictory evidence" undermining her position, or "refuse to engage with contrary epidemiological studies while offering no supporting studies in return." *Rimbert v. Eli Lilly & Co.*, 2009 WL 2208570, at *14 (D.N.M. July 21, 2009), *aff'd*, 647 F.3d 1247 (10th Cir. 2011); *see also McEwen v. Baltimore Washington Med. Ctr. Inc.*, 404 F. App'x 789, 791 (4th Cir. 2010) (affirming exclusion of expert testimony where expert "failed to meaningfully account for medical literature at odds with their testimony").

Finally, in Dr. Siddiqui's own words, Mr. Roberts had cirrhosis that was "obvious," "overwhelming," and "aggressive" at the time of his cancer diagnosis. [Siddiqui Dep. 92:9-15, 136:20-21, 244:17-19, 247:10-12, 267:10-12.] It is not uncommon for cirrhosis and liver cancer to be diagnosed at the same time. [Mahmud Tr. 128:2-11; Vaz 2022.[27]] But she provides no explanation for why this aggressive

---

[27] "Vaz 2022" refers to Juan Vaz et al., Unrecognized liver cirrhosis is common and associated with worse survival in hepatocellular carcinoma: A nationwide cohort study of 3473 patients, 293 J. of Internal Med. 184 (2022) [Rose Decl. Ex. 46 (Docket No. 3072-45)]. This study showed that 39% of HCC patients had unrecognized

decompensated cirrhosis was not the cause of Mr. Roberts's cancer. At the *Daubert* hearing, Dr. Siddiqui suggested that the NDMA exposure from valsartan likely caused the cirrhosis that was discovered in August 2018. [Siddiqui Tr. 96:2-97:15.] But she provides no scientific literature, record evidence, or analysis to support this opinion. It is nothing more than speculative *ipse dixit*.[28]

In sum, Dr. Siddiqui ignored the immensely high increased risk of HCC associated with cirrhosis based upon unreliable methods that ignored the facts of the case and contradictory scientific literature. Her opinions – supported by nothing more than her speculative *ipse dixit* – must be excluded.

### b. *Timeline*

The true crux of Dr. Siddiqui's opinion ruling out cirrhosis, however, is the timeline during which Mr. Roberts developed HCC, which Dr. Siddiqui characterizes as atypical. [*See, e.g.*, Siddiqui Tr. 28:23-29:2 ("The *only reason* I ruled in NDMA and [ruled out] cirrhosis not caused by NDMA is because . . . the studies show that cirrhosis to HCC usually takes around seven to ten years.") (emphasis added).] She is persistent throughout her testimony that the cirrhosis may develop into HCC only

---

cirrhosis at the time of their cancer diagnosis. "These patients were more often male, older, and had larger tumors" and "had worse median survival." *Id.*

[28]    Plaintiff attempts to bolster Dr. Siddiqui's testimony with a citation to a report from the U.S. Department of Health and Human Services Agency for Toxic Substances and Disease Registry. [Pl.'s Opp'n at 13–14.] But Dr. Siddiqui did not rely on this report in forming her opinion and, as Defendant correctly notes, "Plaintiff cannot unilaterally supplement [Dr. Siddiqui's] opinion in *Daubert* briefing." [Defs.' Reply at 10 n.8 (citing *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 407 (S.D.N.Y. 2005).]

through a "slow stepwise progression" that takes seven to ten years.  [*See, e.g.*, *id.* 47:3-10, 50:3-11, 53:2-9.]  Therefore, according to Dr. Siddiqui, the absolute earliest Mr. Roberts's cirrhosis could have developed into HCC is April 2023 (assuming he had early-stage cirrhosis in April 2016).  [*Id.* 51:9-21.]

Strictly on its face, this theory is appealing.  How else can cirrhosis – with its massive hazard ratio – be definitively ruled out?  Upon this Court's required scrutiny, however, the opinion is just a house of cards.  The timeline Dr. Siddiqui espouses is backed by neither the scientific literature nor the record evidence, however.  It is based solely upon Dr. Siddiqui's unsupported *ipse dixit*.  Without this supposedly atypical timeline, her opinion collapses.  Dr. Siddiqui herself recognized this, conceding that her entire opinion would need to be reworked if the timeline were different.  [*Id.* 110:20-111:7.]

With respect to the timeline that Dr. Siddiqui embraces, there is no evidence that Mr. Roberts's cirrhosis began in April 2016.  Because Mr. Roberts did not undergo any imaging between 2009 and 2016, it is not possible to ascertain when it first arose.  Indeed, Plaintiff's expert radiologist, Dr. Mele, recognized this.  [Mele Dep. 172:22-173:11.]  And it defies common sense to assume that the indicia of cirrhosis evident in the April 2016 CT scan arose for the first time on that day.  In other words, there is no scientific or factual basis for Dr. Siddiqui's assumption (and that is what it is) that Mr. Roberts did not have cirrhosis prior to the April 2016 CT scan.  *See Hoefling v. U.S. Smokeless Tobacco Co., LLC*, 576 F. Supp. 3d 262, 281 (E.D. Pa. 2021) (it is "improper to treat [a well-established risk factor] as implausible simply because no conclusive test

was performed" demonstrating that plaintiff had it). What's more, as the Court has already explained, the medical records in this case strongly suggest that Mr. Roberts may have had cirrhosis for many years prior.[29] Yet Dr. Siddiqui did not even consider this evidence in formulating her opinion.

The more fundamental issue with Dr. Siddiqui's timeline opinion, however, is that the timeline itself lacks a reliable scientific basis. Dr. Siddiqui's seven-to-ten-year timeline from cirrhosis to HCC derives exclusively from one inapposite study.[30] [Siddiqui Tr. 70:18-22.] The Johnson 2024 study involved hepatitis C patients who had received effective antiviral therapy. The study's goal was to "assess the impact of antiviral treatment on cirrhosis progression and HCC development." [Johnson 2024 at 2; *see also* Mahmud Tr. 161:17-23.] Needless to say, Mr. Roberts did not have hepatitis C nor was he cured of his risk factors for HCC. Dr. Siddiqui offers no explanation for why the timeline set forth in a study about patients cured of hepatitis C would be applicable to Mr. Roberts, a patient with several other known risk factors for liver cancer, but not hepatitis C. At most, she speculates that this timeline is "conservative" and that it likely would have taken even longer for MASH cirrhosis to develop into HCC. [Siddiqui Tr. 50:6-21.] This is based on her "assumption" that

---

[29] For example, per Dr. Mahmud's calculations, Mr. Roberts's Fib-4 score was 1.99 in September 2009, representing indeterminate fibrosis, and 3.22 in November 2015, representing advanced fibrosis and possible cirrhosis. [Mahmud Report at 21.]

[30] Philip J. Johnson et. al, *Progression of chronic liver disease to Hepatocellular (Liver) carcinoma: implications for surveillance and management, BJC Reps.* (2024) ("Johnson 2024") [Rose Decl. Ex. 50 (Docket No. 3071-49)].

Mr. Roberts's cirrhosis was less aggressive than the cirrhosis experienced by the cured hepatitis C patients in the Johnson 2024 study.  [*Id.* 72:18-73:16.]  She admits this is simply an assumption.  The Court need not permit her testimony that is based on mere "guesswork."  *Zostavax*, 579 F. Supp. 3d at 683 ("Reliable expert medical testimony, not lay assumptions or guesswork, is required under *Daubert*.").

What's more, she overstates the Johnson 2024 study's findings.  Contrary to her characterization, the study does not say that liver cancer can *only* develop seven to ten years after cirrhosis arises.  Instead, it found that the *median* time from cirrhosis to liver cancer diagnosis in the specific patient population involved was seven years.  [Johnson 2024 at 3.]  That this is the median time, rather than the minimum time as suggested by Dr. Siddiqui, means that there will necessarily be patients who develop liver cancer sooner.  Critically, she does not account for this possibility in categorically ruling out cirrhosis as the cause of Mr. Roberts's cancer.

Dr. Siddiqui cited no other scientific basis for the timeline.[31]  Nor did she account for data and literature that contradicted her established position.  She did not

---

[31]    At one point, Dr. Siddiqui testified that other studies confirm this timeline, but at no point did she provide any other citations.  [Siddiqui Tr. 111:8-17.]  Incredulously, Plaintiff's counsel suggested at oral argument that Dr. Siddiqui did not even need a study to back up her timeline opinion: "she could have no studies and talk about this timeline from her own experience."  [9/3/25 Tr. 25:2-9.]  Be that as it may, that was *not* the basis for her opinion.  She did not testify that in her experience, the progression from cirrhosis to HCC in Mr. Roberts's case was atypical.  Rather, she expressly and exclusively relied upon Johnson 2024 to develop her differential diagnosis.  The Court does not consider Dr. Siddiqui's experience – proffered not by Dr. Siddiqui herself, but rather after the fact by counsel – to be sufficient to rectify the flaws in her methodology.

account for the medical guidelines that recommend screening cirrhosis patients every six months because the risk of developing liver cancer is so high.  [Mahmud Tr. 124:20-125:25, 159:11-19.]  Nor did she account for the CDC guidance that indicates a four-year latency period for solid cancers like HCC to develop.[32]  She also failed to consider whether Mr. Roberts's cancer progression was consistent with the medical literature regarding Stage III cancer and survival rates.  Mr. Roberts was diagnosed with Stage III cancer in August 2018 and passed away in March 2020, approximately eighteen months later.  Defendants point out that this is consistent with the medical literature establishing that the median survival time for patients with "large tumor sizes" of "5 cm" or greater, like Mr. Roberts, is just 18.80 months.[33]  Unfortunately, the five-year survival rate for patients with advanced HCC, like Mr. Roberts, is "less than 20%."[34]  Dr. Siddiqui's refusal to engage with contradictory data while focusing exclusively on data from the inapposite Johnson 2024 study is at odds with a

---

*See Rezulin*, 369 F. Supp. 2d at 407 ("The subject of [a *Daubert*] motion is the proposed testimony of experts, not the theories of the lawyers.").

[32]    WTC    Health    Guidance    Document    at    5, https://www.cdc.gov/wtc/pdfs/policies/WTCHP-Minimum-Cancer-Latency-PP-01062015-508.pdf.

[33]    Sangheun Lee et al., *Subclassification of Barcelona Clinic Liver Cancer B and C hepatocellular carcinoma: a cohort study of the multicenter registry database*, 31 J. of Gastroenterology & Hepatology 842, 843 (2016) [Rose Decl. Ex. 34 (Docket No. 3072-33)].

[34]    Evelyn Calderon-Martinez et al., *Prognostic Scores and Survival Rates by Etiology of Hepatocellular Carcinoma: A Review*, 15 J. Clin. Med. Res. 200, 203 (2023) [Rose Decl. Ex. 33 (Docket No. 3072-32)].

systematic differential diagnosis and follows no reliable methodology. *See In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 797 (3d Cir. 2017) ("if an expert applies certain techniques to a subset of the body of evidence and other techniques to another subset without explanation, this raises an inference of unreliable application of methodology.").

The cornerstone of Dr. Siddiqui's opinion – that HCC caused by cirrhosis arises seven to ten years after cirrhosis diagnosis – lacks any reliable scientific foundation.  It is premised only upon her *ipse dixit* and misapplication of the scientific literature.  Her opinion that Mr. Roberts's cancer could not have been caused by cirrhosis has no reliable scientific basis and must be excluded.

### ii.    Dr. Siddiqui Did Not Reliably Rule Out Mr. Roberts's Other Known Risk Factors

Dr. Siddiqui's treatment of Mr. Roberts's other known risk factors fares no better.  Based on little else than her own say-so, she opined that his risk factors could all be considered together and that their impact was limited to increasing Mr. Roberts's risk of developing cirrhosis.  And since she had already ruled out cirrhosis as a cause, the other risk factors fell by the wayside as well.  But this approach is contrary to the established scientific literature and not the product of a reliable methodology.

Dr. Siddiqui did not consider each of Mr. Roberts known risk factors independently and instead lumped his numerous conditions – specifically, MASLD/MASH, obesity, diabetes, and hyperlipidemia – under the umbrella of metabolic syndrome.  Dr. Siddiqui claimed that "the way we do it in basically

medicine now, is we put it all under [MASLD] . . . They put in hyperlipidemia, diabetes, and obesity into a group of diseases when talking about liver cancer or liver disease."  [Siddiqui Dep. 197:1-25.]  But this approach is undermined by ample scientific evidence that Dr. Siddiqui either ignores or misconstrues.  Even the one study Dr. Siddiqui cites as support for her approach does the exact opposite.[35]  As Defendants point out, Mantovani 2017 "emphasizes the 'independent' nature of risk factors for HCC, including obesity, and notes that these risks are 'additive' in individuals, like Mr. Roberts, with multiple risk factors for HCC."  [Defs.' Reply at 15 n.10.][36]  Accordingly, the Court finds that Dr. Siddiqui's opinion employs an unreliable method that lacks acceptance and support in the scientific literature.  *See Magistrini*, 180 F. Supp. 2d at 603 (excluding expert testimony as scientifically unreliable where expert treated various cancers "together for etiological purposes" without "sufficient scientific support for this theory").

And, as explained below, the great weight of the scientific literature establishes that each of Mr. Roberts's conditions was an *independent* risk factor for HCC.  Indeed, as Dr. Siddiqui herself admitted, each independently carries a higher increased risk

---

[35]    Alessandro Mantovani & Giovanni Targher, *Type 2 diabetes mellitus and risk of hepatocellular carcinoma: spotlight on nonalcoholic fatty liver disease*. 5 Ann. Transl. Med. (2017) ("Mantovani 2017") [Rose Decl. Ex. 53 (Docket No. 3072-52)].

[36]    This literature is consistent with the testimony of Defendants' expert hepatologist, Dr. Mahmud, who testified that each risk factor is studied independently in the literature and that he did not understand Dr. Siddiqui's approach because there is "no justification for lumping them together . . . in the literature."  [Mahmud Tr. 139:11-23.]

than NDMA exposure does. [*See* Siddiqui Tr. 103:16-104:4.][37]  But she did not engage with this literature, much less refute it.  She made "no attempt to quantify the relative contribution of [Mr. Roberts's] risk factors," rendering her opinion unreliable.  *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (affirming exclusion of expert).  As part of its critical gatekeeping function, this Court must ensure that Dr. Siddiqui "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *See Kumho*, 526 U.S. at 152.  Based on the record before it, this Court simply cannot make that finding.  Dr. Siddiqui used an approach that is not supported by the medical and scientific literature, rendering her testimony unreliable.

### a.  MASH/MASLD

Dr. Siddiqui appeared to equate MASLD/MASH and the umbrella metabolic syndrome she described.  But she distorted and misrepresented the record in her attempt to rule out MASH or metabolic syndrome as the cause of Mr. Roberts's HCC.  In her report, Dr. Siddiqui unmistakably opined that "[w]hile ***Mr. Roberts had NASH*** with no evidence of decompensation, his resulting increased risk of liver would be captured based on the degree of his liver cirrhosis."[38]  [Siddiqui Report at 30 (emphasis added).]  She confirmed this belief at her deposition: "Yes, I do believe that

---

[37]    When pressed, Dr. Siddiqui testified that, although she cannot be sure, each of these independent risk factors "may have" contributed to the cause of Mr. Roberts's cancer.  [Siddiqui Tr. 109:20-23.]

[38]    Recall that NASH is now referred to as MASH.  *See supra* n.7.

[Mr. Roberts] had NASH before his [cancer] diagnosis based on my review of his medical records." [Siddiqui Dep. 200:1-6.]

Yet in the *Daubert* briefing and at the *Daubert* hearing, Plaintiff and Dr. Siddiqui changed tack. The line became that Mr. Roberts was never diagnosed with MASH and so MASH could not have been the cause of his cancer. Indeed, Dr. Siddiqui repeatedly and insistently testified as much. [*See, e.g.*, Siddiqui Tr. 63:10-14, 84:11-13; 98:15-22.] She claimed, contradicting her report, that, at most, "there was a questionable diagnosis of NASH," but no "proper full diagnosis of NASH was [ever] made." [*Id.* 98:15-22.] And, according to Dr. Siddiqui, "[t]here were some notes that said consistent with NASH. But there was no official diagnosis of NASH." [*Id.* 63:10-14.] Aside from unjustifiably elevating form over substance, this opinion is contradicted by the record.

Mr. Roberts's 2009 medical records state unequivocally that his treating physician's "impression" was "nonalcoholic steatohepatitis with no evidence of decompensation." [Summ. J. Rose Decl. Ex. 27 at GRobertsJr-CA-000654.] There is nothing "questionable" about this noted diagnosis. "NASH" then continues to appear throughout his medical records as part of his past medical history. [*See, e.g.*, Rose Decl. Ex. 17 at GRobertsJr-ESMS-000002, GRobertsJr-ESMS-000045, GRobertsJr-ESMS-000051, GRobertsJR-CA-000210.] And Mr. Roberts's cancer was frequently described by his treating physicians as HCC in the setting of "NASH cirrhosis."

[*See, e.g.*, Rose Decl. Ex. 5 at GRobertsJr-UABHIM-MD-000083;[39] Rose Decl. Ex. 29 at GRobertsJr-PPR-000096.]  Her attempt to unilaterally discount this clear diagnosis is not supported by the record and is based on pure conclusion-driven speculation.[40]

Dr. Siddiqui also improperly relied upon Dr. White's note to support her opinion that Mr. Roberts was never diagnosed with MASH.  She claims that the note, written in August 2018, states that his doctors "had done a full review in the past and had not found liver disease" and that "he had a completely normal liver workup." [Siddiqui Tr. 84:7-14, 102:8.]  Not so.  She has cherrypicked one phrase from the note and ignored the rest.  While the note states that Mr. Roberts's "[w]ork up for cirrhosis is essentially negative," it goes on to explain that the "[l]ocal workup is negative *for*

---

[39]    Mr. Roberts's radiation oncologist described Mr. Roberts's cancer as "HCC arising out of NASH cirrhosis." [Rose Decl. Ex. 5 at GRobertsJr-UABHIM-MD-000085.]  Dr. Siddiqui urges the Court to ignore this assessment because the physician was a resident, rather than an attending, and because he "he has half an hour to quickly make the history . . . he doesn't know what [Mr. Roberts] was exposed to . . . He is seeing a questionable history of NASH and he's seeing cirrhosis." [Siddiqui Tr. 101:1-21.]  But this is entirely speculative.  Dr. Siddiqui admits as much.  She never spoke with the resident physician, and she had "no idea" what he was thinking when he wrote his note.  [*Id.* 102:3-6.]

[40]    In one instance, Dr. Siddiqui went so far as to testify that Mr. Roberts's "fatty liver was never diagnosed officially." [Siddiqui Tr. 110:1-3.]  But "fatty liver" appears throughout Mr. Roberts's medical records.  [*See generally* Rose Decl. Ex. 17.]  In fact, Mr. Roberts had been consistently told by his doctors since he was a teenager that he had fatty liver.  [Rose Decl. Ex. 6 at GRobertsJr-CA-000661.]  This is yet another example of the lengths to which Dr. Siddiqui went to distort the record to serve Plaintiff's desired outcome.  Such a results-oriented approach is unreliable and cannot be presented to a jury.

*viral source*."[41]  [Rose Decl. Ex. 29 at GRobertsJr-PPR-000093, GRobertsJr-PPR-000096 (emphasis added).]   It further states that Mr. Roberts had no "significant [history of] liver disease *other than risk factors for NASH cirrhosis*."  [*Id.* at GRobertsJr-PPR-000097 (emphasis added).]  Dr. Siddiqui's decision to rule out MASH as a cause of Mr. Roberts's cancer is additionally unreliable and disconnected from the record in this case insofar as it cherry-picks and mischaracterizes portions of Dr. White's note to support or confirm her position.  *See Allen v. Am. Cap. Ltd.*, 287 F. Supp. 3d 763, 786 (D. Ariz. 2017) (excluding an expert's testimony where expert "cherry-picked the data for his analysis to produce a litigation-driven result.").

Finally, Dr. Siddiqui simply assumed that – contrary to the scientific literature – "[a]ny increased risk of liver cancer that Mr. Roberts was at [due to his metabolic syndrome] would essentially be captured by the degree of cirrhosis he had prior to being exposed to valsartan contaminated with NDMA."  [Siddiqui Report at 30.] According to this assumption, she could then rule out MASLD/MASH as causes by ruling out cirrhosis.  For the reasons previously articulated, *see supra* Section IV.C.i.,

---

[41]    This is consistent with Dr. Mahmud's interpretation of this record.   He explained that a "cirrhosis work up" involves a blood test "to identify potential causes of cirrhosis, things like hepatitis B virus, hepatitis C virus, antibodies to look for different types of autoimmune liver disease, certain types of testing to look for genetic causes of liver disease."  [Mahmud Tr. 190:1-6.]   "When all of that returns negative, which means to say that we don't identify any evidence of hepatitis B, hepatitis C, autoimmune liver disease, et cetera, we refer to that as a negative cirrhosis workup. There is no blood test for MASH or MASLD, so that's never really kind of referred to as being a positive element of this cirrhosis workup."  [*Id.* 190:7-12.]

the Court finds her exclusion of cirrhosis as a cause of Mr. Roberts's cancer to be unscientific, unreliable, and detached from the facts of the case.

Most problematic, however, is the fact that the scientific literature undermines the validity of Dr. Siddiqui's assumption. It is true that MASLD and MASH can lead to HCC in part because they can cause cirrhosis. But the scientific literature also establishes that MASLD and MASH are *independent* risk factors for HCC. As Dr. Siddiqui herself recognizes, MASLD "has been increasingly linked to liver cancer, especially in individuals with progression to [M]ASH" and "[a]pproximately 13% of patients diagnosed with HCC without a background of cirrhosis were noted to have" MASLD. [Siddiqui Report at 21.][42] This is confirmed by studies establishing that "[i]n non-cirrhotic subjects, those with [MASH] have a higher risk of HCC compared to other []etiologies of liver disease."[43] Other published studies establish hazard or odds ratios between 1.82 and 7.62.[44] And, even putting MASH aside,

---

[42]    Perplexingly, despite her own expert agreeing that MASLD/MASH can be an independent risk factor for HCC, Plaintiff apparently takes the position that it is not a risk factor at all for HCC. [*See* Pl.'s Opp'n at 20 n.84.]

[43]    Jonathan G. Stine et al., *Systematic review with meta-analysis: risk of hepatocellular carcinoma in non-alcoholic steatohepatitis without cirrhosis compared to other liver diseases*, 48 Ailment Pharmacol Ther. 696 (2018) ("Stine 2018") [Rose Decl. Ex. 10 (Docket No. 3072-9)].

[44]    *See, e.g.*, Fasiha Kanwal, et al., *Risk of Hepatocellular Cancer in Patients With Non-Alcoholic Fatty Liver Disease*, 155 Gastroenterology 6 (2018), *available at* https://pubmed.ncbi.nlm.nih.gov/30144434/; Qingyan Kong et al., *Impact of Metabolic Dysfunction-Associated Fatty/Steatotic Liver Disease on Hepatocellular Carcinoma Incidence and Long-Term Prognosis Post-Liver Resection: A Systematic Review and*

studies establish that MASLD alone is associated with a hazard ratio of 1.80 – or 80% increased risk of HCC – even in patients without cirrhosis.[45]  Notably, all of the scientific literature establishes that MASLD and MASH carry an increased risk for developing HCC far greater than that associated with NDMA exposure.

Dr. Siddiqui herself recognized this.  [Siddiqui Tr. 102:12-24.]  And yet, she failed to engage with this scientific literature.  Instead, she summarily excluded the possibility of MASLD/MASH directly causing Mr. Roberts's cancer for two scientifically unreliable reasons.  First, according to Dr. Siddiqui, the "metabolic syndrome to HCC" pathway is "rare."  [*Id.* 53:12-15.]  But Dr. Siddiqui made no attempt to quantify how rare it is compared to what she calls the more common pathway of metabolic syndrome to cirrhosis and then finally to HCC.  Nor did she explain why it is scientifically and medically appropriate to rule out a cause simply because it is uncommon.  As articulated, Dr. Siddiqui's opinion amounts to nothing more than speculative *ipse dixit*.

Second, Dr. Siddiqui rejected this pathway because Mr. Roberts "had cirrhosis at some point," so "the direct NASH to HCC" pathway "wasn't making sense in [his] case."  [*Id.* 53:16-25.]  But the fact that Mr. Roberts had cirrhosis "at some point" cannot eliminate the possibility that his MASLD/MASH contributed to *both* the

---

*Meta-Analysis*, Academic Radiology (2025) [Rose Decl. Ex. 59 (Docket No. 3072-58)]; Stine (2018).

[45]    Fahim Ebrahimi, et al., *Familial coaggregation of MASLD with hepatocellular carcinoma and adverse liver outcomes: Nationwide multigenerational cohort study*, 79 J. of Hepatology 1374 (2023) [Rose Decl. Ex. 11 (Docket No. 3072-10).]

development of cirrhosis *and* HCC.  Dr. Siddiqui has presented no basis – other than her own say-so – to assume that these pathways are mutually exclusive.  The Court need not take her word for it.  *See* FED. R. EVID. 702, advisory committee's note to 2000 amendments.  Indeed, as Dr. Mahmud testified, the risk is "synergistic. . . . So if you have multiple of these risk factors, that each independently increase the risk, there is a kind of an additive effect where if you have all of these [risk] factors, your risk is even higher."  [Mahmud Tr. 141:5-16.]  Accordingly, the Court finds that Dr. Siddiqui's opinion that MASLD/MASH was not a cause of Mr. Roberts's cancer is speculative and based on nothing more than her *ipse dixit*.  She did not employ a reliable methodology in reaching her conclusion and so her opinion must be excluded.

### b. Diabetes

Once again, Dr. Siddiqui ignored inconvenient medical records and scientific literature to rule out diabetes as a cause of Mr. Roberts's cancer, rendering her opinion unreliable.  It is undisputed that diabetes is an independent risk factor for HCC. [Siddiqui Tr. 106:8-9.]  Indeed, a 2017 study cited by both parties establishes that Type II diabetes, which Mr. Roberts had, is "closely associated with increased risk of HCC . . . independent of . . . obesity . . . and presence of cirrhosis and hepatic steatosis." [Mantovani 2017 at 3.]  The scientific literature further establishes an 150% increased risk associated with diabetes independent of other factors.  [*Id.*] Dr. Siddiqui, however, does not engage with these studies and wholly fails to explain why diabetes can be reliably ruled out despite carrying a higher increased risk of liver cancer than NDMA exposure.  *See Magistrini*, 180 F. Supp. 2d at 610 ("to properly

assess the specific cause of an individual's illness, a *quantitative* risk assessment must be undertaken" for each risk factor); *see also Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir. 1997) (defining a proper differential diagnosis as "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a *systematic comparison and contrasting* of the clinical findings.").

Rather than supporting her opinion with scientific data, Dr. Siddiqui purports to rule out Mr. Roberts's diabetes "as causing or even meaningfully increasing his risk of liver cancer" for two reasons.   [Siddiqui Report at 30.]   First, according to Dr. Siddiqui, "Mr. Roberts was not diagnosed with diabetes until November 14, 2016 – after [he] started taking NDMA contaminated valsartan." [*Id.*] Second, Dr. Siddiqui found his diabetes to be "well controlled."   [*Id.*]   Both these reasons, however, are belied by the record.  Mr. Roberts's December 2007 medical records note that he had "DM," or diabetes mellitus.  [Rose Decl. Ex. 12 at GRobertsJr-CA-000729.][46]  And in July 2016 – months before ever taking a contaminated valsartan pill – Mr. Roberts's records show that he had "Type 2 diabetes mellitus with hyperglycemia," and that his hemoglobin A1C levels were 9.5%, representing uncontrolled glucose levels.  [Rose Decl. Ex. 13 at GRobertsJr-AMG-000042-44.]  Dr. Siddiqui eventually conceded that

---

[46]    Plaintiff argues this document reported just possible diabetes, not an actual diabetes diagnosis. [Pl.'s Opp'n at 18.] Either way, there is ample evidence of diabetes in Mr. Roberts's medical records well before he began taking the contaminated valsartan, all which Dr. Siddiqui outright ignored.  Indeed, Dr. Mahmud also noted several other medical records that noted the diagnosis of "DM" or "diabetes mellitus" in June 2007, December 2007, and May 2008.  [Mahmud Report at 6.]

Mr. Roberts did have high hemoglobin A1C, "but he was trying to control it." [Siddiqui Tr. 110:1-2.]

Ultimately, her opinion regarding the link between Mr. Roberts's diabetes and his cancer is totally divorced from the facts of the case. Even assuming Mr. Roberts's diabetes was well-controlled – which the record evidence indicates it was not – Dr. Siddiqui cites no scientific data to support her claim that well-controlled diabetes does not increase the risk of developing liver cancer. This opinion relies solely on her *ipse dixit* and is, therefore, patently unreliable and must be excluded.

### c. Obesity

The scientific literature establishes that obesity is an independent risk factor for HCC.[47] Obesity has been associated with as high as a 286% increased risk for HCC, even after adjusting for cirrhosis.[48] Dr. Siddiqui does not dispute this increased risk [Siddiqui Tr. 103:16-104:4], but she simply brushes it off.

---

[47]    *See, e.g.*, Xuancheng Xie et al., *Correlation analysis of metabolic characteristics and the risk of metabolic-associated fatty liver disease-related hepatocellular carcinoma*, Scientific Reports (2022) ("Xie 2022") [Rose Decl. Ex. 15 (Docket No. 3072-14)].

[48]    Xie 2022 at 6; *see also* Baek Gyu Jun et al., *Impact of overweight and obesity on the risk of hepatocellular carcinoma: a prospective cohort study in 14.3 million Koreans*, 127 Brit. J. of Cancer 109 (2022) [Rose Decl. Ex. 21 (Docket No. 3072-20)] (hazard ratio of 1.55 associated with obesity after adjusting for diabetes and hazard ratio of 1.60 for each 5 kg/m$^2$ increase in BMI); Yi Chen et al., *Excess body weight and the risk of primary liver cancer: An updated meta-analysis of prospective studies*, 48 Eur. J. of Cancer 2137 (2012) [Rose Decl. Ex. 22 (Docket No. 3072-21)] (risk ratios of 1.69 associated with obesity after adjusting for alcohol use, 1.89 associated with obesity after adjusting for hepatitis, and 2.06 associated with obesity after adjusting for diabetes).

Despite Mr. Roberts's longstanding history of both Class II and Class III obesity [*See generally* Rose Decl. Ex. 17], Dr. Siddiqui chose not to address this literature at all. Rather, she summarily concluded that "the increased risk of liver cancer due to obesity would have been negligible, and again best captured based on the degree of his liver cirrhosis." [Siddiqui Report at 30.] She did not even attempt to quantify the increased risk posed to Mr. Roberts due to his long-term significant history of obesity or compare that increased risk to any increased risk caused by exposure to NDMA. Had she, she would have been forced to grapple with the fact that the studies universally establish a higher increased risk due to obesity than NDMA exposure. Dr. Siddiqui failed to address relevant scientific literature, quantify and compare relative risk ratios for different risk factors, or explain her reasoning for finding that any increased risk due to obesity was "negligible." For these reasons, the Court finds that Dr. Siddiqui's decision to rule out obesity was scientifically unreliable.

### iii.    Dr. Siddiqui Did Not Reliably Rule in NDMA Exposure from Valsartan

Defendants contend that Dr. Siddiqui has no scientific basis for "ruling in" exposure to NDMA-contaminated valsartan as a potential cause of Mr. Roberts's HCC. The Court agrees. Dr. Siddiqui had no reliable basis to conclude that the level of NDMA to which Mr. Roberts was exposed could have, much less *did cause*, his cancer. Instead, she inferred a causal relationship between NDMA exposure and liver cancer from the limited human studies when the authors expressly disclaimed causality. She speculated about the true increased risk of cancer and dose response

based upon her *ipse dixit* alone. And she opined on the timeline and temporal proximity of Mr. Roberts's exposure to NDMA and his cancer based on, in her own words, "pure speculation." [Siddiqui Tr. 88:9.] In short, her testimony was not based on sufficient data and is not the product of reliable principles and methods.

Admittedly, there is a small body of scientific literature addressing the link between NDMA exposure and liver cancer. Plaintiff argues that this is because "NDMA is too toxic to ethically test on humans," and that Dr. Siddiqui should not be faulted for the paucity of on-point studies. [Pl.'s Supp. Br. at 1.] Surely, the Court does not. But the lack of on-point studies does not excuse Dr. Siddiqui's wholesale unsupported speculation and *ipse dixit* assertions relating to the studies that do exist. *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452, 467–68 (E.D. Pa. 2008).

Dr. Siddiqui has no reliable basis rooted in the scientific literature for ruling in NDMA exposure from valsartan as a possible cause of Mr. Roberts's HCC. She testified that her decision was based on several studies that purportedly showed a causal relationship between NDMA exposure at the levels found in valsartan and liver cancer. As noted above, the studies are few and far between. Dr. Siddiqui employed no reliable methodology in assessing the findings of the few studies that exist at this time. And none provides a reliable basis for her conclusions.

### a. The Gomm and Mansouri Studies

Only two studies exist that have found a statistically significant association between NDMA ingestion from a medication and cancer: Gomm and Mansouri.

Neither study, however, was able to establish a causal relationship.[49] Mansouri qualified its findings, stating that "[m]ore research is needed to gain further evidence and to understand more deeply the relationship between NDMA exposure and the risks of liver cancer . . . and to establish clinically relevant causality." [Mansouri at 12.]  Gomm put it more bluntly: "the present study can only state the existence of a statistical association [between NDMA exposure and cancer]. *Causality cannot be inferred*."  [Gomm at 360 (emphasis added).]  Yet that is precisely what Dr. Siddiqui did.

Not only did Dr. Siddiqui infer causality from these studies, but she also failed to grapple with the very low risk levels reported in those studies – hazard ratios of just 1.16 and 1.12, respectively.  Instead, she opined that any increased risk found in Gomm and Mansouri was "diluted" and that the true risk was significantly higher. [Siddiqui Tr. 33:7-34:24, 40:15-41:19.]  The ZHP-manufactured valsartan taken by Mr. Roberts contained far more NDMA than the valsartan manufactured by most other companies.  For example, a 320 mg valsartan pill manufactured by Defendants contained 13.18 to 20.19 micrograms of NDMA.  By contrast, a 320 mg valsartan pill manufactured by Hetero Labs Ltd. contained just 0.33 to 0.44 micrograms of

---

[49]    Pottegård – the only other study that addressed this – found no association between NDMA exposure in valsartan and liver cancer.

NDMA.[50]  According to Dr. Siddiqui, because the Gomm and Mansouri studies did not distinguish between the type of pill taken by the study participants and necessarily included participants who took pills with lower concentrations of NDMA, the results must be diluted.

Intuitively, Dr. Siddiqui's dilution theory makes sense.  But expert testimony cannot be based on intuition alone.  It must be backed by data and scientific evidence. *Calhoun*, 350 F.3d at 321 ("the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"). Under scrutiny, it is clear that this theory is based on nothing more than speculation. Dr. Siddiqui admits as much.  She concedes that the studies do not disclose what pills were being taken by the study participants and that the participants "may have just filled one prescription as compared to those people like Mr. Roberts who may have filled multiple prescriptions."  [Siddiqui Tr. 80:17-81:4.]  Underlying this speculative theory, however, is an assumption that dose response has been established.  In other words, the more NDMA a person is exposed to, the more likely they are to develop cancer.  But this assumption is just as speculative.  As Dr. Siddiqui herself recognizes, "none of the valsartan epi studies detected a dose response."  [Siddiqui Report at 26.]

Putting that issue aside for the time being, the studies are missing the data that is critical to support her theory: the types of valsartan pills ingested, the dose of

---

[50]    FDA Laboratory analysis of valsartan products, *available at* https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-analysis-valsartan-products ("FDA Lab. Analysis").

valsartan, the frequency at which the valsartan was taken, and the duration of exposure. [*See* Siddiqui Tr. 81:20-83:7.] Also missing is any data on the market share of the various manufacturers, which Dr. Siddiqui recognized is "really important." [*Id.* 82:8-83:7 (explaining that it is possible that Hetero dominates the French market, but not considering the inverse that perhaps ZHP does, which would undermine her assumptions).] Dr. Siddiqui assumes that the study participants overall were exposed to less NDMA than Mr. Roberts. But that is purely speculation. As counsel put it and Dr. Siddiqui could not deny, "it could go the other way." [*Id.* 83:8-11.] Dr. Siddiqui agreed that it is possible that the study participants could have been exposed to far more NDMA than Mr. Roberts was either because of the type of pills they took or the duration of exposure. [*Id.* 83:13-20.]

Dr. Siddiqui's opinion that Gomm and Mansouri establish that NDMA exposure in valsartan is a cause of cancer is simply not the product of reliable methodology. Rather, this Court has no hesitancy in finding that it is patently results-oriented and ignores what undermines her conclusion. In reaching this conclusion, Dr. Siddiqui ignored other possible scenarios and overstated the scientific data available to support her finding.[51]

---

[51] This is not the only time Dr. Siddiqui has ignored scenarios or data that undermined her conclusion. In its Laboratory Analysis, the FDA "estimated that if 8,000 people took the highest valsartan dose (320 mg) containing NDMA from the recalled batches daily for four years, there may be one additional case of cancer over the lifetimes of the 8,000 people." [FDA Lab. Analysis.] Rather than consider this, Dr. Siddiqui once again discounted the findings due to her dilution theory, despite recognizing on cross-examination that the FDA was fully aware of the differing levels

### b. *The Hidajat Study*

Next, Dr. Siddiqui relied upon Hidajat and various animal studies to establish dose response. But she did not do so reliably. The Court first addresses her reliance on Hidajat. Hidajat is "an occupational cohort study of 36,441 men who worked in a rubber factory in the United Kingdom." *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1214 (S.D. Fla. 2022). According to Dr. Siddiqui, this study establishes dose response because the factory workers "who were exposed to higher amounts of NDMA in the industry were more likely to die due to liver cancer than workers who were exposed to lower amounts of NDMA in the factory." [Siddiqui Report at 26.] From this, she opines that "the human study also demonstrated a dose-response." [*Id.*] But her reliance on this study to establish dose response in the context of NDMA in an ingested tablet is woefully misplaced and unreliable.

This Court is not the first to address an expert's use of Hidajat to conclude that an NDMA-contaminated medication can cause cancer. It has the benefit of a thorough opinion from its sister court in the Southern District of Florida, which concluded that "an expert opinion that relies upon the [Hidajat study] to conclude that [a drug containing NDMA] can cause cancer utilizes an unreliable methodology" for reasons that apply with equal force here. *Zantac*, 644 F. Supp. 3d at 1214–15.

"First, there are too many inherent uncertainties in [the Hidajat] occupational study for such data to be reliably applied to the causation question in this MDL." *Id.*

---

of contamination in different valsartan products when it issued its analysis. [Siddiqui Tr. 91:8-92:22.]

at 1215.  "Specific to the Hidajat occupational study, the number of assumptions and

estimations necessary to render this study helpful to a jury are staggering."  *Id.*  The

*Zantac* court explained those "staggering" assumptions as follows:

> workers continued to work in the factory after 1967; workers retired at
> age 70; workers never ceased to work until they were 70; workers never
> moved to another department with different NDMA-exposure levels; and
> workers never left the rubber industry to be exposed to different
> carcinogens in some other occupation.  Additionally, an estimation was
> necessary to compute the amount of NDMA each worker breathed in his
> department, given that such data was never recorded.  Finally, the study
> authors had to try to adjust for confounding variables and for the
> possibility that other carcinogens in the rubber factory could have caused
> a worker's cancer.

*Id.* at 1215–16.  The author of the study herself testified in the *Zantac* MDL "that her

study was not designed to assess NDMA exposure through an oral medication."

*Id.* at 1216.  "The route of exposure—skin absorption, inhalation, and ingestion—is

no small matter.  Those routes affect the magnitude of ultimate exposures and because

they often affect health outcomes in different ways."  *Id.* (cleaned up) (quoting *Reference

Manual on Scientific Evidence* 71 (3d ed. 2011) at 518).  Critically, in relying "on the

studies of others," an expert "must not exceed the limitations the authors themselves

place on the study.  That is, she must not draw overreaching conclusions."  *Id.* (cleaned

up) (internal citations omitted).

"For the Hidajat study to possess some level of relevance, an expert would have

to testify at trial that the inhaled and absorbed fumes from a 1967 rubber factory may

be reliably converted into an ingested dose of" contaminated valsartan.  *Id.*  "And of

course, for such a conversion to be part of a reliable methodology, it would also have

to be weighed in conjunction with assumptions about how long a worker worked, where they worked, and what they were exposed to. Then further assumptions and estimations would be necessary for comparison." *Id.* at 1217. Additionally, an expert would have to "account for the fact that . . . rubber fumes contain other chemicals, including other established carcinogens" and determine whether "the levels of NDMA in [valsartan] were comparable to the levels of NDMA that the subjects in" the Hidajat study inhaled. *In re Zantac (Ranitidine) Litig.*, 342 A.3d 1131, 1154 (Del. 2025).

Yet Dr. Siddiqui has made no attempt whatsoever – let alone a reliable attempt – to extrapolate the Hidajat findings to the facts at bar. Instead, she concluded, without explanation or reliable basis, that dose response exists between ingested NDMA in valsartan and liver cancer because it was – shakily, at best – established in the Hidajat study via completely distinct routes of exposure and at unknown levels. There is "simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Accordingly, the Court further finds Dr. Siddiqui's methodology unreliable insofar as it relies upon the Hidajat study. *See Zantac*, 644 F. Supp. 3d at 1217.

### c. Animal Studies

Finally, Dr. Siddiqui relied upon animal studies to establish a causal relationship, dose response, and a significantly shortened latency period for cancer caused by NDMA exposure. She testified that the animal studies show that animals exposed to NDMA develop cancer "very rapidly," and that the more NDMA the animals were exposed to, the more likely they were to develop cancer. [Siddiqui

Tr. 38:4-8, 39:2-5, 85:22-25.]  From this, she infers that dose response would hold true in the context of humans at the levels exposed to in the contaminated valsartan.  And, despite being unable to opine on what amount of NDMA exposure was required to cause Mr. Roberts's cancer, she claims he could have developed cancer after "even a few doses."  [*Id.* 88:1-3.]

Generally, courts are "reluctant to allow expert testimony based upon animal studies to prove causation in humans unless there are good grounds to extrapolate data and results from animals to humans."  *In re Hum. Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 670 (D.N.J. 2008) (citing *Paoli*, 35 F.3d at 742–43).  And for good reason. A rat is not a person.  This should go without saying.  Yet Dr. Siddiqui wholly "fail[ed] to take into account critical differences between animal data and human experience— including but not limited to extrapolations in dosing—render[ing] [her] methodology scientifically invalid and unreliable."  *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 547 (W.D. Pa. 2003); *see also Joiner*, 522 U.S. at 144–45.

"The use of animal studies to prove causation in human beings has 'two significant disadvantages,' which 'are almost always fraught with considerable, and currently unresolvable, uncertainty.'  First, extrapolating from animals to humans is difficult because 'differences in absorption, metabolism, and other factors may result in interspecies variation in responses.'"  *Soldo*, 244 F. Supp. 2d at 466 (quoting Federal Judicial Center, Reference Manual on Scientific Evidence, at 130 (1994)).  Indeed, rats typically have much shorter lifespans than humans, meaning that the timelines of disease in rodents and humans differ considerably.  *See Zantac*, 644 F. Supp. 3d

58

at 1279–84.  But Dr. Siddiqui did not consider these differences or this so-called "translation gap" in formulating her differential diagnosis.  [*See* Mahmud Tr. 134:21-136:20.][52]  Plaintiff argues that Dr. Siddiqui relied on Dr. Panigrahy's "translation mechanism" as set forth in his general causation report.  [9/3/25 Tr. 27:15-22.]  But the Court sees no reference whatsoever to Dr. Panigrahy's – or any other – translation mechanism in Dr. Siddiqui's report or testimony.  Instead, she testified that just a few doses over the course of just weeks to months could cause cancer in humans, just as it could in rodents.  [Siddiqui Tr. 87:22-88:13.]

"A second difficulty is that 'the high *doses* customarily used in animal studies requires consideration of the *dose-response relationship* and whether a threshold no-effect dose exists." *Soldo*, 244 F. Supp. 2d at 466 (quoting Federal Judicial Center, Reference Manual on Scientific Evidence, at 130 (1994)) (emphasis in original).  Dr. Siddiqui does not engage at all with the fact that the rats studied were injected with massive amounts of NDMA – orders of magnitude higher than what Mr. Roberts was exposed to.  [*See* Chodosh Dep. 227:4-15 (Docket No. 3117-2) (extrapolating from animal study inappropriate because Mr. Roberts's cumulative exposure to NDMA was "several thousand times lower" than the dose given to animals).]  Instead, she simply assumes

---

[52]    Dr. Mahmud, Defendants' specific causation expert, explained that epidemiologists and clinicians are "always cautious [when] try[ing] to translate findings from an animal study directly to humans because inherently humans are different from mice."  [Mahmud Tr. 131:14-24.]  He testified that any extrapolation must account for this "translation gap" and not "just blindly extrapolate something you see in an animal study and assume that the same thing will be observed in humans."  [*Id.* 135:3-16.]

the existence of a dose-response relationship at any level of exposure in humans because a dose response relationship at extremely high levels of exposure has been established in rodents. [Siddiqui Tr. 85:22-25.] She does not explain the basis for this extrapolation. She essentially just asks that the jury take her word for it. But the Court need not accept expert opinions "connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.[53]

When asked how much NDMA-contaminated valsartan was necessary to cause Mr. Roberts's cancer, Dr. Siddiqui was unable or unwilling to say. Her response was simply: "I believe that the amount that he had caused his cancer." [Siddiqui Tr. 87:11-12.] The exchange that followed bears repeating here:

> Q. What I'm trying to understand is when is the point, according to your theory, that [Mr. Roberts] had consumed enough contaminated valsartan such that he developed cancer? Does that make sense?
>
> A. So my understanding based on my reading is this, that NDMA is such a potent cancer-inducer that even a few doses, even a few, even weeks to months can cause cancer.
>
> Now, again, Your Honor, of course this is in animal studies, but if we extrapolate the weeks to months, if we extrapolate it to a year, for example, the fact that NDMA is such a strong cancer-inducer and promoter – I don't know at which point he got the cancer. I believe it

---

[53]    Dr. Siddiqui appears to suggest that because the FDA has stated that consuming up to 0.096 micrograms of NDMA per day is considered reasonably safe for human ingestion, any exposure above that is automatically capable of causing cancer. [*See* Siddiqui Tr. 85:15-20, 86:3-14.] And Plaintiff argues that the fact that the FDA used animal studies in formulating this cutoff somehow justifies Dr. Siddiqui's reliance on those studies. [9/3/25 Tr. 23:23-25.] Both miss the point. "[T]he FDA primarily engages in a process of risk assessment rather than determination causation, and the relevance to causation of evidence used to assess risk is not clear." *In re Diet Drugs*, 2001 WL 454586, at *15 (E.D. Pa. Feb. 1, 2001).

was somewhere maybe in around 2018, *but this is pure speculation*. The reason being that it was so aggressive that he started having symptoms. So I would assume, my assumption is that it would have been a fast-growing cancer, and he would have sought help as soon as it started to grow.

[*Id.* 87:22-88:13 (emphasis added).]  A break then ensued.  Thereafter, the colloquy continued:

> Q.  Dr. Siddiqui, when we left off we were looking at this slide that you showed earlier this morning in talking about it's true, is it not, that you were unable to tell us at what point on this chart, in your view, Mr. Roberts had consumed enough contaminated valsartan to cause his HCC; true?

> A.  So what I was trying to say was that based on the data that I reviewed, it can be -- *NDMA can sometimes be as quick as weeks to months. So it could be at any point*.  And then I was trying to -- I think I went into this explanation of how with the carcinomas you can't always tell when they arise, so we assume, we make the assumption that they, depending on the type of cancer, that they really started growing when the patient first starts having symptoms.  So I was just sort of talking about that.

> Q.  And so in your view, it could have been just a few weeks of taking contaminated valsartan that Mr. Roberts had consumed enough in your opinion to cause his HCC, correct?

> A.  My opinion is that although there are animal studies, Your Honor, that talk about a few weeks to a few months, I think for Mr. Roberts, it must have been -- *again, this is pure speculation*, Your Honor, because we don't know, we don't know that, but I think what we do know is it came up somewhere between 2016 and 2018, right, most likely, I think.  *But, again, it's pure speculation*, I think it was somewhere probably late 2017, maybe early 2018.  And the reason I think that is because he -- he went in when he started having symptoms.  And he started having symptoms when his cancer must have, you know, grown to a point that it was causing him issues.  And that's why I'm *speculating* that it may have been somewhere in late 2017, 2018.  And he continued to take the contaminated valsartan throughout that.

> Q.  And what that means, Dr. Siddiqui, just to round out this questioning on this slide, is you can't give us a particular dose of

contaminated valsartan that is necessary in order to induce HCC, correct?

    A.  So there are no studies that I can think of that look at that.

[*Id.* 89:9-90:20 (emphasis added).]  This rampant speculation cannot reliably support Dr. Siddiqui's decision to rule in NDMA exposure as the cause of Mr. Roberts's cancer.

Plaintiff argues that even if dose response cannot be reliably established, Dr. Siddiqui's testimony supports a temporal proximity theory of causation.  But her testimony that NDMA can cause significantly accelerated cancer development is also based on speculative and unreliable extrapolation from animal studies.  Dr. Siddiqui testified that NDMA causes mutations that cause cancer "very rapidly, sometimes as early as weeks to months in animals, of course, . . . because we don't have human studies."  [*Id.* 39:2-5.]  But the lack of human studies does not excuse her failure to account for the differences between rats and humans.  She later testified that "the literature and the data" shows that NDMA can cause cancer "in months," without even a caveat that this timeline comes from studies on rats, not humans.  [*Id.* 47:11-13.]  And, as Dr. Siddiqui repeatedly stated, her opinion as to when Mr. Roberts developed cancer and, therefore, the relevant latency period, is based on nothing more than pure speculation.  [*Id.* 87:22-88:13, 89:9-90:20.]  She uses the word "extrapolate" but then does not actually do any reliable extrapolation or translation from the animal studies to humans.  Any meager attempts to extrapolate a dose response relationship or shortened latency period from the animal studies to humans are not based upon good

grounds or reliable methods, but rather speculation. *Joiner*, 522 U.S. at 146; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005) ("*Daubert* requires the trial court to act as a gatekeeper to [ensure] that speculative and unreliable opinions do not reach the jury.").

Dr. Siddiqui made no attempt to reliably extrapolate any of the data or results in the animal studies to humans. She did not consider the drastically different life cycles of rats and humans to reliably determine a latency period in humans, or the massive difference in the doses to which the rats and Mr. Roberts were exposed to reliably establish a dose-response relationship in humans. *Soldo*, 244 F. Supp. 2d at 547 (expert testimony based on animal studies is unreliable where it does not "take into account critical differences between animal data and human experience— including but not limited to extrapolations in dosing."). She made the questionable and unsupported "assumption that chemicals behave similarly in different species." *Daniels-Feasel v. Forest Pharms., Inc.*, 2021 WL 4037820, at *13 (S.D.N.Y. Sept. 3, 2021), *aff'd sub nom. Daniels-Feasel v. Forest Pharms., Inc.*, 2023 WL 4837521 (2d Cir. July 28, 2023). The analytical gap between the animal studies and Dr. Siddiqui's causation opinions is simply too great. *See, e.g., Zantac*, 644 F. Supp. 3d at 1280–84; *Oddi*, 234 F.3d at 146 (reliability requirement prohibits "too great a gap between the data and the [expert's] proffered opinion."). Accordingly, the Court finds that

Dr. Siddiqui's causation, dose response relationship, and temporality opinions are unreliable and must be excluded.[54]

As the Mansouri study noted, "[m]ore research is needed to gain further evidence and to understand more deeply the relationship between NDMA exposure and the risks of liver cancer." [Mansouri at 12.]  To be sure, limited studies exist at this time.  But, contrary to Plaintiff's protestations, "the non-existence of good data does not allow expert witnesses to speculate or base their conclusions on inadequate supporting science."  *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452, 467–68 (E.D. Pa. 2008).  The *Perry* court put it well:

> In cases where no adequate study shows the link between a substance and a disease, expert testimony will generally be inadmissible, even if there are hints in the data that some link might exist.  This may mean that early victims of toxic torts are left without redress because they are unable to prove their cases with the scientific data that exists.  While this is a regrettable result in those individual cases, it is an unavoidable reality of the structure of our legal system and is necessary to protect the interests of defendants who might otherwise be subject to crippling verdicts on the basis of slender scientific evidence. . . . As the Seventh Circuit has noted,

---

[54]    Even if Dr. Siddiqui had reliably ruled in NDMA exposure from valsartan as a possible cause, the Court agrees with Defendants that her determination that this was the only substantial factor in causing Mr. Roberts's cancer is not the product of a reliable application of established principles and methods.  Her differential diagnosis is fundamentally flawed in that it lacks any comparison or assessments of the relative risks of HCC associated with each of Mr. Roberts's known risk factors and his NDMA exposure.  *See, e.g.*, *Ervin v. Johnson & Johnson, Inc.*, 2006 WL 1529582, at *7 (S.D. Ind. May 30, 2006), *aff'd*, 492 F.3d 901 (7th Cir. 2007) (excluding causation expert opinion where expert ruled in one cause associated with a small increased risk while refusing to rule in other causes associated with higher risks); *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 218 F. Supp. 3d 700, 718 (N.D. Ill. 2016), *aff'd sub nom. In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*, 884 F.3d 746 (7th Cir. 2018) (expert's differential diagnosis was unreliable where it applied "inconsistent" standards "to determine which potential causes are reasonable and should be ruled in.").

> "[t]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it."

*Id.* at 468 (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996)). "Based on the data that exist today," this Court easily concludes that Dr. Siddiqui's opinions regarding the causal and dose response relationships between NDMA exposure in valsartan and liver cancer are "mere guesswork." *Id.* at 469. "While such speculation is appropriate in the laboratory where a hypothesis can be tested by experiment, it has no place in the courtroom where no such testing is possible." *Id.*

———————————

For these reasons, the Court finds that Dr. Siddiqui's testimony is not based on sufficient facts and data, is not the product of reliable principles and methods, and does not reflect the reliable application of the principles and methods to the facts of the case. Accordingly, her testimony must be excluded for failure to comply with the strictures of Rule 702.

## V.     MOTION FOR SUMMARY JUDGMENT

### A. <u>The Legal Standards Governing Summary Judgment Motions</u>

Summary judgment is granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining

whether a genuine dispute of material fact exists, "all evidence is viewed in the light most favorable to the non-moving party and 'all justifiable inferences are to be drawn in his favor.'" *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214, 220 (3d Cir. 2024) (quoting *Anderson*, 477 U.S. at 255). A "mere scintilla of evidence," however, does not generate a genuine dispute of material fact. *Anderson*, 477 U.S. at 252.

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250 (citing FED. R. CIV. P. 56(e)).

The nonmovant's burden is rigorous. The nonmovant "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.")). If the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial,'

66

then summary judgment is appropriate for the moving party." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022) (quoting *Celotex*, 477 U.S. at 322).

### B. <u>Summary Judgment is Appropriate Because Plaintiff Cannot Establish Specific Causation</u>

Under Alabama law, "[r]egardless of the cause of action asserted, whether a defective product caused a plaintiff's alleged injuries is 'an essential element of all product liability cases.'" *Lowery v. Sanofi-Aventis LLC*, 535 F. Supp. 3d 1157, 1175 (N.D. Ala. 2021). In other words, "[a]n essential element of all product liability cases is expert testimony, passing *Daubert* muster, that a defect was the medical cause of plaintiff's claimed injuries." *Id.* at 1172. Both evidence of general and specific causation must be established. *Id.*

Plaintiff has conceded on the record that without Dr. Siddiqui's testimony, Plaintiff has no evidence to present at trial addressing specific medical causation and, as a result, summary judgment against Plaintiff is appropriate on each of her claims. [9/3/25 Tr. 9:9-25 ("Mr. Nigh: If [Dr. Siddiqui is] excluded, then we wouldn't have testimony at trial on that key issue [of specific medical causation] which would be grounds from summary judgment. Chief Judge Bumb: On all claims? Mr. Nigh: Yes."); *id.* 11:7-15 ("Chief Judge Bumb: . . . I am excluding Dr. Siddiqui's opinion. The plaintiffs concede that all of their claims fail as a matter of law and summary judgment should be entered? . . . Mr. Nigh: That's correct.").] Without evidence "to establish the existence of an element essential to [Plaintiff's] case, and on which

[Plaintiff] will bear the burden of proof at trial," summary judgment must be granted in favor of Defendants and against Plaintiff. *Celotex*, 477 U.S. at 322.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude the Opinions of Dr. Fareeha Siddiqui [Docket No. 3068] and Motion for Summary Judgment [Docket No. 3061] are **GRANTED**.  The Court hereby enters summary judgment in favor of Defendants and against Plaintiff on each of Plaintiff's claims, and this bellwether personal injury case will be dismissed in its entirety with prejudice.  An appropriate Order and Judgment shall issue on this date.

s/Renée Marie Bumb
RENÉE MARIE BUMB
Chief United States District Judge

Dated: November 10, 2025